**OLD COLONY TRUST CO.** et al. v.
**UNITED STATES.**

No. 5958.

District Court, D. Massachusetts.

June 16, 1936.

William H. Gulliver, Jr., John T. Noonan, and Phillips Ketchum (of Herrick, Smith, Donald & Farley), all of Boston, Mass., for plaintiff.

Francis J. W. Ford, U. S. Atty., of Boston, Mass., for the United States.

418

**SWEENEY, District Judge.**

This is an action at law, commenced May 25, 1934, to recover estate taxes and interest alleged to have been illegally assessed and collected by the respondent.

The facts are as follow: The Old Colony Trust Company and Cornelius A. Wood, petitioners, qualified as executors under the will of William M. Wood on March 8, 1926. Their testate died on February 2, 1926. On or about July 28, 1927, the petitioners filed with the collector of internal revenue, then in office, a federal estate tax return, duly executed, and later paid sums aggregating $349,511.12 as estate taxes and interest thereon. On or about June 11, 1930, the petitioners, pursuant to an additional assessment of estate tax, paid to the collector additional principal in the sum of $58,644.75 and interest thereon in the amount of $23,653.38, making total payments of $404,108.50 in principal and $27,700.75 in interest, with respect to the estate tax upon the net estate of the decedent. In their tax return the petitioners claimed as deductions from the gross estate subject to tax the aggregate sum of $665,316.25. These deductions were allowed by the Commissioner of Internal Revenue as properly deductible, with the exception of one item for $90,000 listed as a debt of the decedent, and hereinafter referred to as the note of the decedent dated August 15, 1922. In addition to the deductions specifically claimed in the return, it referred to a disputed claim of the United States government for back income taxes and other matters not now pertinent. Subsequent to the filing of this return, the petitioners paid the sum of $2,080,309.30 as principal and interest on federal income taxes assessed against the estate with respect to taxable income received by the decedent during the years 1919 to 1925, inclusive (except 1921). Of the last-mentioned amount, $348,136.16 was paid to the government as interest accruing on the income taxes subsequent to the death of the decedent. On January 23, 1930, the petitioners seasonably filed a claim for refund of the estate taxes and interest thereon. This claim for refund was amended and supplemented by a claim for refund filed on January 30, 1931. Among the matters referred to in the claims for refund was the right to deduct from the gross estate subject to tax certain debts of the decedent which included $2,080,309.30 paid by the petitioners as income taxes and interest thereon. The claims for refund were rejected by the Commissioner of Internal Revenue, and the executors were so advised by letter dated June 7, 1934.

The decedent in 1899 was one of the founders of the American Woolen Company, and served as its treasurer until 1905, and thereafter until December 31, 1924, as its president and chief executive. He was a dynamic and aggressive individual, and an indefatigable worker. Much of the success of the American Woolen Company was, no doubt, due to his efforts. Between 1918 and 1924, when practically all the transfers hereinafter referred to, and claimed by the government to have been made in contemplation of death, occurred, he was, in addition to his work as the chief executive of the American Woolen Company, directing the creation of a model mill community, widely known as the Shawsheen Village at Andover, Mass. The Arden Trust, of which he was the sole trustee, and of which his children were the sole beneficiaries, participated with the American Woolen Company in this project, which cost millions of dollars. During that same period the decedent was a director of the Pierce Manufacturing Company and of the Kilburn Mills, both textile manufacturers of New Bedford, Mass., an officer or director of the Merchants' National Bank of New Bedford, and the National Association of Textile Manufacturers, and was a director of the Chase National Bank of the city of New York. During the same period he also took an active interest in the affairs of the Edington Company, a wool brokerage concern of which his son, William M. Wood, Jr., who died in 1922, was a part owner. Late in 1922, at the request of the Chase National Bank, the decedent undertook the reorganization of the Consolidated Textile Corporation, a large group of textile mills, and directed their management until November, 1924. During the years 1923 and 1924 the decedent purchased land at Palm Beach, Fla., and constructed a large and expensive residence for himself. He was a wealthy man, and his income from all sources for the years 1918 to 1925, inclusive, averaged more than a million dollars per year. His net worth as appearing on his books varied between 1915 to 1925, but at no time during that period was he worth less than $2,967,788.31, nor more than $5,000,000. At the time of his death his gross estate to-

talled $4,750,911.47, unless it can be found to be increased by certain claims of the defendant which will hereinafter be discussed. The decedent lived with his wife and four children, William M. Wood, Jr., Cornelius A. Wood, Rosalind Wood, and Irene Wood. From the time when the decedent first became a wealthy man he habitually made generous gifts to members of his family and to others. From 1915 to 1925 inclusive, his gifts to his family and others, and their totals, were as follows:

| Year | Family | Others | Total |
|------|--------|--------|-------|
| 1915 | $ 66,995.57 | $68,472.90 | $ 135,468.47 |
| 1916 | 466,812.84 | 58,089.95 | 524,902.79 |
| 1917 | 775,848.64 | 37,659.55 | 813,508.19 |
| 1918 | 654,929.49 | 66,859.63 | 721,789.12 |
| 1919 | 445,151.82 | 82,233.09 | 527,384.91 |
| 1920 | 332,875.08 | 51,907.53 | 384,782.61 |
| 1921 | 2,419,572.47 | none | 2,419,572.47 |
| 1922 | 260,000.00 | none | 260,000.00 |
| 1923 | 437,138.91 | none | 437,138.91 |
| 1924 | 633,075.93 | none | 633,075.93 |
| 1925 | 99,049.56 | none | 99,049.56 |

It is to be noted that, except for the year 1921, the year during which the Arden Trust was created, his gifts to his family were quite consistent, averaging about $417,186.78 per year.

Prior to January of 1922, the decedent's health had been normal, except that for a period of years he had suffered from a urethral stricture which occasionally needed sounding. Outside of this he suffered only the usual indispositions to which every one is subject. Early in 1922 he had an attack of Bell's palsy, which manifested itself in a slight and temporary paralysis of the muscles in his left cheek. This lasted but a couple of weeks, and the decedent made a complete recovery from it. He resumed his normal good health until the spring of 1924, when he suffered what was later diagnosed as a mild shock. He was at the time in Havana, Cuba, and the shock was not of a sufficient force to prevent his returning to his home in Palm Beach, Fla., within a day or two. On his return from the South in April, 1924, he had made a good recovery, and immediately resumed his duties as heretofore described. In no way was he incapacitated from resuming his former duties, and as early as May, 1924, attended the silver jubilee celebration of the American Woolen Company, and continued to attend social functions during the succeeding months. Late in August of the same year the decedent suffered another shock which was milder than the previous one. At that time he was advised by his physicians to give up some of the laborious work that he was doing, and as a result of this advice, and upon the insistence of his friends, he resigned his activities with the American Woolen Company on December 31, 1924. At that time he seriously considered remaining on as chairman of the board, but his friends and physicians prevailed upon him to sever all his connections with the woolen company. In the spring of 1925 he took a trip abroad which was uneventful. During 1925 he continued his activities with the Kilburn Mills in New Bedford, and with other concerns. So far as the evidence discloses, he gave no indication during this period that he was considering death, or that his condition worried him. In January of 1926 he went to Florida, as was his custom, and on February 2, 1926, died from a self-inflicted bullet wound. There was no evidence that this suicide was other than an impulsive and unpremeditated act. I find nothing in the conduct of the decedent during the period prior to his going to Florida, either from the mental or physical aspect, which would indicate at any time prior to the date of his death that he contemplated suicide or death. As previously mentioned, he had for more than ten years, and perhaps for a much longer period, had a urethral stricture which from time to time required sounding. This disability, while doubtless bothersome and annoying, was in no wise dangerous to life, and there is nothing in the evidence to indicate it had any particular effect upon the decedent, and I find that it is unconnected with his death.

In 1916 the American Woolen Company fixed the salary of the decedent at a certain percentage of the total gross sales of the company, and adopted the following resolution: "Voted, That this Company pay any and all income taxes, State and Federal, that may hereafter become due and payable upon the salaries of all the officers of the Company, including the President, William M. Wood; the Comptroller, Parry C. Wiggin; the Auditor, George R. Lawton, and the following members of the staff, to wit: Frank H. Carpenter, Edwin L. Heath, Samuel R. Haines and William M. Lasbury:—to the end that said persons and officers shall receive their salaries or other compensation in full without deduction on account of income taxes, State or Federal, which taxes are to be paid out of the treasury of this corporation."

On March 25, 1918, the following resolution was adopted by the board of directors of the American Woolen Company: "Voted, That, referring to the vote passed by this Board on August 3, 1916, in reference to income taxes, State and Federal, payable upon the salaries or compensation of the officers and certain employees of this Company, the method of computing said taxes shall be as follows, viz: The difference between what the total amount of his tax would be, including his income from all sources, and the amount of his tax when computed upon his income excluding such compensation or salaries paid by this Company."

As a result of these votes, the woolen company did pay the income taxes on the salary paid to the decedent. Before the decedent's death, the Commissioner of Internal Revenue notified him of the determination of a deficiency in income tax, and from then on litigation between the government and the decedent ensued, and in the case of the Old Colony Trust Co. v. Commissioner of Internal Revenue, 279 U. S. 716, 49 S.Ct. 499, 73 L.Ed. 918, the Supreme Court of the United States held that payment of the income taxes assessable against the compensation of the decedent, and made in consideration of his services, constituted additional taxable income of the decedent. As a result of that decision, the decedent having died during the pendency of the suit, the executors were called upon to pay, and did pay, to the government $2,080,309.30 as hereinbefore mentioned. Of this amount $1,680,-395.67 was principal; $51,777.47 interest to the date of his death; and $348,136.16 interest accruing after the death of the decedent. The petitioners, having paid this money as a debt of the decedent, claimed the right to deduct these payments from the gross estate of the decedent reported for estate tax purposes. Their right to such a deduction is the largest claim herein presented against the government.

Having paid this huge income tax, and relying on the vote of the directors of the American Woolen Company "to pay any and all income taxes * * * upon the salary of * * * William M. Wood," the petitioners filed suit against the American Woolen Company to recover the amount paid as principal and interest on income taxes. The American Woolen Company filed an answer setting up that it had fully performed its obligation under the vote of the board of directors, and certain other defenses, among which was one to the effect that the petitioners were barred from recovery against the American Woolen Company, by reason of the fact that the decedent, during his lifetime, had committed numerous acts of infidelity to the woolen company, and had repeatedly violated his duty to the company, by reason of which losses in excess of the amount sued for by the petitioners had occurred. The woolen company also brought a separate action against the petitioners to recover damages for the alleged acts of infidelity on the part of the decedent. Other similar suits were brought by affiliates of the woolen company against the petitioners. The cases were all consolidated, and referred to a master for hearing. All parties were represented by eminent counsel. Hearings were held over a period of 106 days of actual trial. In December, 1931, the master submitted to counsel for all parties a draft report of his findings. Shortly thereafter a settlement was arrived at between the parties, and no recovery was had by the petitioners. The cases were disposed of by the exchange of mutual releases, and without the payment of any money by any party, except that the widow of the decedent paid the sum of $175,000 to the American Woolen Company as their expense of trial.

One of the contentions of the government is that, if it is found that the petitioners are entitled to deduct from the gross estate of the decedent the sum of $2,080,309.30 paid as income taxes of the decedent, the estate of the decedent should be increased by a similar amount, first, because they had a good claim against the American Woolen Company in the amount of $2,080,309.30 under the vote of the American Woolen Company directors, and, secondly, because in settling their differences with the woolen company the plaintiffs actually received from the woolen company value to the amount of $2,080,-309.30.

I find that the action of the petitioners in abandoning their claim against the American Woolen Company and disposing of the suits by the American Woolen Company and affiliates against their estate was reasonable and justified. There was a serious question of law involved in their original claim. They were confronted by the possibilities of defeat of that claim, if it were otherwise valid, by reason of the acts

of infidelity on the part of the decedent toward the woolen company, and there was a risk of further subjecting the estate to the possibility of the woolen company and affiliates recovering in their actions against the estate. Since the petitioners prosecuted their claim against the American Woolen Company to a finality, and because they recovered nothing from it, and because I can reach no conclusion other than that the petitioners were diligent in the prosecution of their claim, and reasonable in its abandonment, I cannot find that the gross estate of the decedent should be increased by any purported value of the claim of the petitioners against the American Woolen Company, for it actually proved valueless. As to the income taxes and interest paid by the petitioners, I find that the sum of $1,680,395.67 paid as principal and the sum of $51,777.47, interest on such amount to the date of the decedent's death, were debts of the estate to the United States, and as such should have been deducted from the gross estate of the decedent subject to federal estate taxes.

■ As to the item of $348,136.16 which represents interest on the income tax due from the decedent which accrued after his death, I can find no authority for deducting this from the gross estate of the decedent subject to federal estate tax. Section 302 of the Revenue Act of 1924 (43 Stat. 304) provides that: "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—."

At the decedent's death, there was due the United States the sum of $1,680,395.67 as principal and $51,777.47 as interest on that principal. As a debt of the estate to the United States, both principal and interest accruing at that time were proper deductions. Interest accruing after the date of the death, however meritorious may have seemed the contention that the estate was not liable to such income tax, was not within the meaning of the act prescribing the time and method of computing the estate of the deceased person for the purposes of estate taxes. To allow the deduction of interest accruing while resisting a valid claim against the estate might result in defeating the very purposes of the Estate Tax Law. There was no novel question presented in the case of the Old Colony Trust Company v. Commissioner of Internal Revenue, supra. Payment of income taxes might have been made under protest, and suit entered for their recovery. That the petitioners elected not to do so, but chose the possibility of paying additional interest during the period in which they protested the right of the government to collect the tax, does not seem to be sufficient reason for deducting it from the gross estate of the decedent subject to tax purposes. I therefore rule that the petitioners are entitled to a deduction from the gross estate subject to federal estate taxes of the sum of $1,680,395.67 principal and $51,777.47 interest from the date of the decedent's death. I also rule that the petitioners are not entitled to a deduction of $348,136.16 as interest accruing after the death of the decedent from the gross estate of the decedent subject to federal estate taxes.

■ The decedent was the owner of certain real estate located in the town of Andover, Mass., and on February 9, 1921, joined his wife in conveying this real estate and other that she owned to his three children, Rosalind Wood, William M. Wood, Jr., and Cornelius A. Wood. They in turn on the same date executed an indenture which created the Arden Trust, making themselves the beneficiaries of said trust, and naming the decedent as trustee. The value of the property at that time was $1,163,472.47. On October 8, 1921, the decedent turned over to the Arden Trust securities in the American Woolen Company and the Pierce Manufacturing Company to the value of approximately $1,256,100. On December 31, 1923, he conveyed certain real estate to the Arden Trust, having a value of $283,861.67. On April 24, 1924, he conveyed real estate at a then value of $17,400, and on June 30, 1924, executed a release of certain indebtedness of the Arden Trust to him in the amount of $490,675.93, making the total value of the Arden Trust, including all gifts, $3,211,510.06. With relation to the cancellation of the debt of the Arden Trust on June 30, 1924, I find that on that date the decedent learned for the first time that his bookkeeper was carrying this indebtedness as a charge against the Arden Trust; that his original intention had not been that it was to be a charge; and that upon its discovery he immediately canceled what ostensibly a debt, but which from its inception he had intended to be a gift to the trust. At the time of the execution of the Arden Trust, I find that the decedent had been

for years consistently making gifts to his children, actuated by a belief which he had often expressed that his children should have funds of their own in order that they might learn to handle money, and prepare themselves for the lives that they would lead as children of a wealthy man. In creating the Arden Trust, he was actuated by a desire to join in the building development of real estate without liability to his personal estate; a desire, if the venture proved profitable, to have his children receive the profits directly from the trust without first having such income subject to the high income tax and surtax rates to which he would have been subject; a desire to create an organization or instrument to engage in other business ventures for the benefit of his children without the profits being subjected to the tax rates that he would have had to pay; and a desire to place this real estate in such a position that it would be free from attachments against him, whether or not such actions were meritorious, and to so place the property in one mass that the profits therefrom could be divided equally among his children rather than to run the risk of an unequal division by attempting to divide the property directly among his children, with the possible result that some might prove less profitable than others. His children at that time had reached an age when he wanted them to have independent incomes, and he made the trust the vehicle for providing such income, retaining the management of the trust so that it would have the benefit of his vast experience as a businessman. His gifts to the trust after its creation, as set forth above, were but the consummation of his original intent when the trust was formed. In all of his gifts to the trust he parted with his entire interest, and the transfers were complete. His purposes were to make his children independent and to avoid the high taxes and surtaxes on his income. Both of these motives were associated with life rather than with death. There is nothing to indicate that he was influenced in what he did by the thought of death. See Becker v. St. Louis Union Trust Co., 296 U.S. 48, 56 S.Ct. 78, 80 L.Ed. 35. I therefore rule that nothing should be added to the gross estate of the decedent subject to federal estate tax by reason of the creation of the Arden Trust, or by reason of the transfer by the decedent to his children of the property that was given to the trust.

■ The government contends that the following transfers of interest bearing deposits were not bona fide transfers, but were testamentary dispositions made in contemplation of death, and that the gross estate of the decedent should be increased by their total values:

February 14, 1918, to Irene Wood
Sutcliff, daughter ............ $200,000
July 30, 1918, to Irene Wood Sutcliff, daughter .............. 50,000
September 3, 1918, to Irene Wood
Sutcliff, daughter ............ 50,000
June 5, 1922, to Irene Wood Sutcliff, daughter ............... 200,000

On January 12, 1918, the decedent's daughter Irene was married. On the day before the wedding the decedent deposited $100,000 in the Chase National Bank, for which he received a certificate of deposit payable to himself as trustee for Irene. On February 14, 1918, he paid over the certificate, together with an additional $50,000 contributed by himself, and $50,000 contributed by the decedent's wife, to the Massachusetts Hospital Life Insurance Company, in exchange for a contract to hold this money for the benefit of Irene. On July 30, 1918, he added $50,000 to this fund, and again on September 3, 1918, he added a similar amount. The daughter Irene died on October 11, 1918, and the government's contention that a gift of $200,000 was made to her on June 6, 1922, was made under mistake of facts. I find that the government abandoned in open court its claim that such transfer had been made, or, if made, was made in contemplation of death. It appears that the decedent had not up to this time made gifts of any substantial nature to Irene. The contract that he purchased from the insurance company provided for payments to Irene during her lifetime, and upon her death to her issue, if any, and under certain conditions to the decedent's other children. The transfer was complete, and he parted with all interest in the matter, and it was only in the event that all of his children should die, leaving no issue, that a reversion to his estate would occur. The grantor reserved no power over that trust. I find that in creating this trust the decedent was establishing an independent income for her, and was doing it on the occasion of her marriage. I find nothing in the evidence to indicate that he was at all

actuated by any thoughts of his own death, and I therefore find that the decedent's gross estate subject to federal estate tax should not be increased by reason of these transfers. See Guy T. Helvering v. St. Louis Union Trust Co., 296 U.S. 39, 56 S. Ct. 74, 80 L.Ed. 29, 100 A.L.R. 1239.

■ Certain other gifts of the decedent to relatives are questioned by the government. It contends that they were in effect testamentary dispositions made in contemplation of death, and should be added to the gross estate of the decedent. On June 30, 1922, the decedent transferred $50,000 from himself personally to himself as trustee for Rosalind Wood. I find that this transfer was brought about as follows: The daughter, Rosalind, unmarried, had been living in New York for two or three years, maintaining an apartment there; that her father paid all of her bills, including her living expenses, upon the receipt of the bills forwarded by her. Upon paying these bills, the decedent charged them to an account which was opened in his books in May of 1920, and the total of the bills so paid up to December 31, 1921, was $52,376.44. On June 30, 1922, the decedent, as trustee for his daughter Rosalind under a trust previously created, paid himself as an individual the sum of $52,376.44 out of the trust funds, and thus canceled the charges appearing on his books against the daughter for bills paid during the above period. In order to make this payment as trustee, he made an advancement from himself personally to himself, as trustee for Rosalind, in the amount of $50,000, which really amounted to a cancellation of the charges appearing on his books for bills paid in her behalf. This claim resolves itself to the mere payment by the father of his daughter's living expenses while she resided on Park Avenue in New York. By no stretch of the imagination could it be termed a gift that was testamentary in character and made in contemplation of death. I rule that the decedent's gross estate subject to federal estate tax should not be increased by reason of this gift.

■ On August 15, 1922, the decedent executed a note payable to himself, as trustee for his daughter Rosalind, in the amount of $120,000, and on the same day executed the note hereinbefore mentioned in favor of his son Cornelius in the amount of $90,000. I find that the note given to Cornelius was for services rendered and to be rendered, and that the note given to himself, as trustee for his daughter Rosalind, was in the nature of a birthday gift. As neither of these notes was paid during the lifetime of the decedent, and in no wise disposed of any part of the decedent's property, they could not be held to be transfers of the decedent's property in contemplation of death. There is no evidence that either of these transfers was made in contemplation of death, and I therefore rule that the decedent's gross estate subject to federal estate tax should not be increased by reason of these transfers. I rule that the $90,000 note which was given for a consideration was a debt of the decedent's at the time of his death, and that the petitioners are entitled to a deduction of this amount from the gross estate subject to federal estate tax.

■ On January 1, 1923, the decedent purchased an annuity for his sister, Emma Wood, and again on January 3, 1925, purchased another annuity for her. On this latter date he also purchased an annuity for his brother, O. P. Wood. In purchasing these annuities, the decedent was carrying out a policy that he had consistently followed of caring for his near relatives. The sister for whom the annuities were purchased was unmarried, living alone, and for years had received substantial contributions from the decedent for her support and maintenance. Her annuities, which gave her an income of $7,000 a year, viewed in the light of the fact that he had substantially contributed to her support for years, were not unusual gifts. I find that the establishment of these annuities was totally disassociated from any thought of death, and that they were not testamentary in character. I therefore rule that the decedent's gross estate subject to federal estate tax should not be increased by reason of these gifts.

■ On February 29, 1924, the decedent transferred a $50,000 paid-up insurance policy on the life of William M. Wood to his daughter, Rosalind Wood. I find that this gift was made by the decedent actually on January 6, 1919, when he designated her as the beneficiary of a $50,000 twenty-year endowment policy on his own life. Being alive at the maturity of the policy, the proceeds were paid to him, and he in turn paid them over to her, not as a gift in contemplation of death, but merely carrying out an intent evidenced on January 6, 1919, that this sum should go to his unmarried daughter. I therefore rule that

this gift was not testamentary in character, nor made in contemplation of death, and that the decedent's gross estate subject to federal estate tax should not be increased by reason of it.

■ Similar gifts of $50,000 on March 26, 1924, and $25,000 on August 29, 1924, were made to Cornelius A. Wood, as trustee for Doris Wood and William M. Wood, 3d, grandchildren of the decedent. The father of these children was William M. Wood, Jr., the son of the decedent, who had been killed in an automobile accident on August 15, 1922. Upon the death of the father, the widow of William M. Wood, Jr., wanted to keep the funds of her late husband invested in the wool brokerage business of the Edington Company. The decedent, opposing such a highly speculative investment, created the trust fund referred to above as a guaranty that the children of the deceased son would not have their sole property invested in the highly speculative wool brokerage business. It was an outright gift, not made in contemplation of death, and not testamentary in character. I therefore rule that the decedent's gross estate subject to federal estate tax should not be increased by reason of these gifts.

■ On January 3, 1925, on the same date on which he purchased the annuities for his sister and brother, he made a gift of $25,000 in cash to his wife, Ellen A. Wood. Mrs. Wood was a woman of independent means for whom he had generously provided during his lifetime. This gift, coming within the two-year period prior to his death, if standing alone, might be held to have been within the provisions of the statute, but finding as I do that he purchased annuities for his own brother and sister on the same day, each annuity in excess of $25,000, I am satisfied that the motive for making this gift to his wife, while not specifically shown, was probably induced by a desire to be as generous to his wife as he was to his brother and sister. I am satisfied that this gift was not made in contemplation of death. I therefore rule that the decedent's gross estate subject to federal estate tax should not be increased by reason of this gift.

In all of the above gifts, I find that the decedent was following out a policy that he had established many years before of allowing the members of his family and his relatives to share in his wealth while he was alive. He gauged his gifts to them by his ability to make them, and by the occasions on which he made the gifts. He was not only a man of great wealth, but also had great earning power, and his gifts to his wife, children, grandchildren, brother, and sister are more consistent with a desire to have them enjoy the immediate benefits of his wealth during his life than with a desire to defeat the imposition of taxes which would have been imposed if the money or property had been left undisturbed until his death. In all of his gifts, he parted with all interest in them, retaining only such direction as would be expected from a man of his training and nature. Far from being in contemplation of death, his gifts were in contemplation of life, and were actuated by a desire to have those close to him share in his good fortune.

It has been stipulated and agreed between the parties hereto that the value of the gross estate of the decedent subject to federal estate tax, at the time of the decedent's death, was $4,750,911.47. I have found, and rule, that this amount is not to be increased by any of the claims of the government hereinbefore discussed. In accordance with the agreement contained in the stipulation filed in this case, I rule that the petitioners are entitled to the following deductions from the gross estate of the decedent subject to estate tax:

| | |
|---|---:|
| Debts of Decedent as claimed in original return (other than Item No. 41 under Schedule I, Debts of Decedent, amounting to $90,000) | $292,918.83 |
| Funeral Expenses | 18,169.93 |
| Expenses of Administration | 214,227.49 |
| Payment to Trustees of Arden Trust pursuant to court decree | 147,465.41 |
| Payment to Dr. Arthur G. Griffin for claimed services | 10,000.00 |
| Additional Attorneys' Fees | 145,389.81 |
| Additional Administration Expenses | 9,000.00 |
| Additional Executors' Commissions | 50,000.00 |
| Specific Exemption | 50,000.00 |
| Total | $937,171.47 |

This deduction leaves a net estate of $3,813,740 subject to tax as found by the Commissioner. In accordance with the foregoing findings and rulings, there is to be a further sum of $1,732,173.14 deducted as debts of the decedent to the United

States government for income taxes, both principal and interest. This further reduces the net estate to $2,081,566.86. There is then to be deducted the $90,000 debt from the decedent to Cornelius A. Wood as evidenced by the note of August 15, 1922, leaving a net estate subject to federal estate tax of $1,991,566.86. This is the amount which should have been taxed. The imposed tax was computed on a much higher amount. Judgment may therefore be entered for the petitioners for whatever amount was paid in taxes on a net estate in excess of $1,991,566.86, with interest at the rate of 6 per cent. per annum from the date or dates of overpayment, and with costs. I will leave the actual computation of the figures to counsel for the parties. In the event that they cannot agree, this court, upon application, will hear and determine that question.

The respondent's requests for rulings are allowed in so far as they are consistent with this opinion, and are denied in so far as they are inconsistent with this opinion. The petitioners' requests for rulings are allowed in so far as they are consistent with this opinion, and are denied in so far as they are inconsistent.

The respondent's motion for judgment is denied.

Judgment may be entered for the petitioners in accordance with the foregoing.