MYERS et al. v. MAGRUDER, Collector of
Internal Revenue.
No. 5817.

District Court, D. Maryland.
July 14, 1936.

Charles G. Page, of Baltimore, Md., for plaintiffs.

Bernard J. Flynn, U. S. Atty., and G. Randolph Aiken, Asst. U. S. Atty., both of Baltimore, Md., and Julian G. Gibbs, Sp. Asst. to Atty. Gen., for defendant.

CHESNUT, District Judge.

The plaintiffs in this case are suing to recover an alleged over-payment of federal estate taxes in the amount of $10,248.07 principal, and $347.02 interest. The taxpayer is the estate of David Myers, late of Baltimore City, who died February 1, 1934, being at the time a citizen of the United States and resident of the State of Maryland. By his duly probated will dated February 28, 1933, he appointed the plaintiffs as his executors. They made in due time an estate tax return which showed no tax payable but the Commissioner of Internal Revenue, after correspondence, finally assessed a deficiency tax in the amount of $10,248.07 which, with the interest, was paid October 19, 1935; and after petition for refund was denied, this suit was instituted January 3, 1936.

In their petition for refund the executors alleged that the claim should be allowed for the following reasons: (1) The Commissioner erroneously included in the gross estate of the decedent (a) property transferred by irrevocable trust deed dated January 28, 1929, to the Mercantile Trust Company and Elkan R. Myers, Trustees, and valued at $19,033.32 for purposes of assessment; (b) property transferred by irrevocable trust deed dated January 24, 1930, to the Mercantile Trust Company and Elkan R. Myers, Trustees, and valued at $5,098.75 for purposes of assessment; (c) the sum of $166,000 asserted by the Commissioner to be the value of an interest in the partnership, David Myers & Sons and alleged to have been transferred in contemplation of death in 1925 within the meaning of section 302(c) of the Revenue Act of 1926 as amended. In 1925 the decedent transferred his entire interest in the capital of the partnership to Elkan R. Myers, reserving only a right to a stipulated salary and one-half of the net profits. Thereafter as his credit for earnings and salary accumulated in the partnership, the decedent on the dates indicated irrevocably transferred to Elkan R. Myers the following amounts which Elkan R. Myers invested in the business:

| September 20, 1928 | $25,000 |
| July 2, 1929 | 20,000 |
| January 26, 1931 | 12,000 |
| January 7, 1933 | 20,000 |
| December 30, 1933 | 45,000 |

In including the disputed items in the value of the gross estate of the decedent, the Commissioner based his actions on the Act of February 26, 1926, c. 27, § 302(c), as amended by the act of June 6, 1932, c. 209, § 803(a). As so amended the statute is now codified in U.S.C.A. title 26, § 411(c), and reads as follows:

"The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside the United States— * * *

"(c) Transfers in contemplation of death. To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter. (Feb. 26, 1926, c. 27, §.302(c), 44 Stat. 70; Mar. 3, 1931, c. 454, 46 Stat. 1516; June 6, 1932, c. 209, § 803(a), 47 Stat. 279.)"

The Commissioner also relied upon Treasury Regulations 80, art. 18, which reads as follows:

"Art. 18. *Transfers with possession or enjoyment retained.*—(a) *Transfers included.*—The statutory phrase 'a transfer * * * intended to take effect in possession or enjoyment at or after his death,' includes a transfer, whether in trust or otherwise, made subject to the reservation by the decedent of the use, or the possession, or the rents or other income of the transferred property, or any part thereof, for his life, or for a period ascertainable only by reference to his death, or for a period of such duration as to evidence his intention to retain the enjoyment (in whole or in part) of the transferred property throughout his life. (See Article 15).

"(b) *Taxability.*—Every such transfer (not amounting to a bona fide sale for an adequate and full consideration in money or money's worth), made by the decedent subsequent to September 8, 1916, is taxable, and the value of the property or interest so transferred shall be included in the gross estate of the decedent. The provisions of this subdivision do not apply (1) if the transfer was made prior to 10.30 p. m., eastern standard time, March 3, 1931, and (2) if the decedent died prior to 5 p. m., eastern standard time, June 6, 1932. See section 506 of the Revenue Act of 1934."

In the trial of the case a jury was waived by the parties in writing and the case tried to the court on a stipulation of facts and testimony of a number of witnesses.

The defendant Collector of Internal Revenue contends that the disputed items were properly included in the computation of the gross estate because the several transfers (a) were made in fact in contemplation of death or (b) were intended to take effect in possession or enjoyment at or after the decedent's death or (c) in any event fall within the language of the statute which includes—"a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from the property."

It is to be noted that the provision just quoted was, in substance, first enacted by resolution of Congress No. 131, on March 3, 1931, and the phraseology then adopted was somewhat changed by the Act of 1932 above referred to. The provision was,

therefore, not included in the law at the date of the several respective transfers in 1925, 1929 and 1930. Nevertheless the defendant Collector contends that the provision is properly legally retrospective in its operation as to these transfers. To the contrary, the plaintiffs contend that to give the provision retrospective operation would be to render it unconstitutional and violative of the due process clause of the Fifth Amendment. And the plaintiffs also contend that the particular transfer in 1925 is of such a nature that it is not in fact covered by the language quoted.

It is also contended by the Collector, in the alternative, that even if the transfers of May 5, 1925, January 28, 1929, and January 24, 1930, are not included as a part of the gross estate, nevertheless the other transfers amounting to $122,000, including particularly the two transfers of $20,000 on January 7, 1933, and $45,000 on December 30, 1933, are to be properly included because made in contemplation of death. And the Collector further contends that, failing the above contentions, he is nevertheless entitled to a set-off in the amount of $259.54 on account of an unpaid gift tax which was due as contended by him on the 1925 transfer. The plaintiffs, however, dispute the set-off contention on the ground that the value of the thing transferred in 1925 was, under the then applicable gift tax law, such that no gift tax was due thereon. And with respect to the transfers of $20,000 on January 7, 1933 and of $45,000 on December 30, 1933, the plaintiffs say that they as executors reported and paid the appropriate tax of $75 under the then applicable gift tax statute.

The principal facts included in the stipulation, and established by the testimony in the case, are as follows: At the time of his death on February 1, 1934, the decedent, David Myers, was about 71 years of age having been born February 25, 1863. Both his parents had died before 1910. His first wife Eva Ries Myers, died in March 1924. He had three children by his first wife who were Elkan R. Myers, born May 19, 1894, Edna Myers who died in 1912 and Herbert Myers born May 1, 1891 and who died in 1914 at the age of 23. The decedent's son, Elkan R. Myers, who alone of his children survived him, had living at the time of his father's death, two children, Ann Myers, born April 2, 1914, and Elkan R. Myers, Jr., born November 1, 1926.

In April 1925 (about the time of the 1925 transfer in question) David Myers married his second wife, Amelia Hirsh Myers, the widow of Dr. Hirsh of Baltimore, who had a son, Josie Hirsh then about 22 years of age. David Myers also had a brother, Joseph H. Myers, and two sisters, Hannah Commings and Freda Glickman, whose family relationship is of no relevancy to the case other than the fact that they are named in the will of David Myers as minor beneficiaries. This then was the family.

Prior to 1911 the business interests of David Myers were only of a minor character, as salesman for a shoe manufacturer. But in 1911 his sons persuaded him to go into business on his own account and he then established a partnership with his son, Herbert Myers, who had a one-fourth interest in the firm. In 1913 Elkan R. Myers, one of the plaintiffs, was also given a one-fourth interest in the business and upon the death of Herbert Myers the other son in 1914, the latter's one-fourth interest was also given to Elkan R. Myers, so that from 1914 to 1925 David Myers and his son, Elkan R. Myers, were equal partners in the firm of David Myers and Sons, engaged in the wholesale shoe business. As of June 30, 1911, the total resources of the business were only about $5,000 with capital invested of about $1,500; but by industry and thrift on May 5, 1925, when the transfer of that year was made, each of the partners had a capital interest of approximately $60,000 in the business. On this last mentioned date David Myers entered into a written agreement with his son, Elkan R. Myers, which constituted the transfer of 1925 in question in this case. By this agreement David Myers transferred to his son the former's "entire and whole one-half interest in such partnership and in the tangible and intangible assets of said partnership; and such partnership is hereby terminated." But by the agreement it was further provided that David Myers should continue to render to the partnership the services theretofore rendered for which he should receive the same salary theretofore received, and also one-half of the net profits thereof "either until the death of the first party, (David Myers), or until the first party shall sooner voluntarily or involuntarily cease to render services to said business (whichever event may first occur); and after said first party shall during his lifetime voluntarily or involuntarily cease to render such services to said business, he shall receive out of the net profits of said business the sum of $3,600 during his lifetime."

This was, of course, an agreement of quite an unusual nature. In legal effect it will be noted that it provides that the partnership is terminated; the capital interest of David Myers is transferred to Elkan R. Myers; David Myers is to be paid for his services a salary and half interest in the profits (after deducting salaries both for him and his son); but that said services might be terminated at the will of Elkan R. Myers, in which event David Myers was thereafter to receive a life annuity of $3,600 which it will be noted is a 6% return on his former capital of $60,000.

The testimony of witnesses explains the reason for this somewhat unusual agreement. At the time Elkan R. Myers was the only surviving child of David Myers. The wife and mother had died the previous year and the business had largely developed and been made prosperous by the industry and energy of Elkan Myers. There were the most cordial and affectionate relations between the father and son. One or two young associates had been brought into the business in minor capacities and looked forward to ultimate larger participation in the business. One of them was a relative of David Myers. The second wife had a son about 22 years of age and it was thought by Elkan Myers and his younger associates in the business that complications might subsequently arise if the new stepson were taken into the business. It was therefore proposed to David Myers shortly before his second marriage that the complete ownership of the business with its current control should be given to Elkan Myers who, however, desired his father to continue his active participation in the business, which was also the desire of the latter. David Myers readily acquiesced in this arrangement and the agreement was formally executed shortly after his second marriage pursuant to understanding previously reached. Thereafter the salary and one-half of the annual profits of the business were from time to time credited to David Myers on the books of the business. Against this from time to time he drew such sums as he needed or desired for living and other expenses and allowed the balance to accumulate to his credit. He also had accumulated capital not invested in the business of between $50,000 and $100,000. At the time of his death, his gross estate (not including the transfers in

question) amounted in value to $50,532.33. On September 20, 1928, his credit balance on the books of the business amounted to $25,000 or more and he thereupon transferred that amount to his son Elkan who in turn invested it in the business. The method of transfer was by check from Elkan Myers to David Myers, by him deposited in his account and he then gave his check to Elkan who in turn reinvested the amount in the business. And similarly on July 2, 1929, the amount of $30,000 was so transferred under similar circumstances, and again on January 26, 1931, $12,000; and in 1933, $20,000 on January 7th and $45,000 on December 30th. In the meantime the second wife of David Myers, Amelia Hirsh Myers, died on October 29, 1932.

It also appeared from the testimony of Elkan Myers that, at his suggestion and with the purpose of securing his father some certain income if needed, he by written agreement dated January 29, 1929 obligated himself and his personal representatives to pay a life annuity to his father in the amount of $1,500 per annum (being 6% on $25,000 which had been transferred as of September 20, 1928) said annuity to begin "from and after the date the said party of the second part (David) shall sever his connection with and cease active participation in and relationship with the wholesale business of David Myers & Sons"; and similarly on July 2, 1929, a like agreement providing for an additional annuity of $1,200 a year to David Myers was executed by Elkan; and again on January 24, 1931, another similar agreement for an additional annuity of $720 was executed. There was however, no such agreement executed in relation to the transfers in 1933, Elkan Myers as a witness explaining that he considered them unnecessary because he had included provision for his father in his (Elkan's) will.

With regard to the physical health and activities of David Myers, the testimony of several business associates established the following: He was active in the business as credit manager until a few months before his death on February 1, 1934, being in practically daily attendance at the office for the period of many years prior to his death with the exception of certain sicknesses and hospitalization to be mentioned. He was a man of erect carriage, bright of eye, seemingly mentally alert and always neat in his dress and personal appearance.

Photographs taken of him at the office a year or so before his death tended to substantiate this description. In 1914 he had a partial prostate operation and in 1919 a complete one. In 1931 he was attended by Dr. Thomas R. Brown of Baltimore for intestinal pains and subsequently an operation was performed by Dr. Harvey B. Stone and an obstruction of a cancerous nature was removed. According to the testimony of physicians he "made a nice recovery— got perfectly well and had an uneventful recovery." He returned to his regular business and, according to witnesses, substantially regained his former health. In July 1932 he was confined to the hospital for two weeks by arthritis. But thereafter resumed his usual business activities at the office and apparently was in normal physical condition, until in December 1932 when he had an attack of influenza with some bronchial pneumonia, from which he had an uneventful recovery. He again returned to the office and apparently was constantly in attendance until in November 1933 when he again had what appeared to be a flare-up of cystitis. The medical certificate of his death signed by Dr. E. L. Leopold, gave as the principal cause of death "cerebral arterio sclerosis" with contributing cause of "bronchial pneumonia." But Dr. Leopold testified as a witness and from his testimony it appeared that the immediate and proximate cause of death was a sudden case of bronchial pneumonia and the cerebral arterio sclerosis was rather a chronic than a critical condition.

With regard to the transfers by deed of trust in 1929 and 1930, it is to be noted that they are in similar form except with regard to the securities transferred. In both David Myers made a transfer to the Mercantile Trust Company and Elkan Myers as Trustees in trust to pay the net income to himself for life and thereafter to pay the same to his son Elkan until the elder of the latter's children attained the age of 21 years, thereafter the principal and interest to be applied as provided for the benefit of Elkan's two children, with other limitations not material in the case. The oral testimony, however, indicated that these transfers of a material but not a major portion of David's estate at the time were induced by his definite desire to make positive and present provision for his grandchildren.

We turn now to the applicable law. It is first contended by the Collector that

all these transfers, of 1925, 1929 and 1930, were in fact made in contemplation of death. The statute (section 411 (c) title 26 U.S.C.A.) provides in the last sentence as follows: "Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this chapter [subchapter]." This presumption here set up is, of course, not applicable to these particular transfers because they were all much more than two years prior to the decedent's death. It appears that the action of the Commissioner in including these transfers in the gross estate was not based on a finding that they had been made in contemplation of death, but by reason of the retrospective operation of the 1932 Act above quoted. And the defendant in this case has submitted no substantial testimony that contemplation of death in fact constituted a substantial motive or inducement for making the transfers. The applicable principles in this connection are to be found in United States v. Wells, 283 U.S. 102, 51 S. Ct. 446, 451, 75 L.Ed. 867; Becker v. St. Louis Union Trust Co., 296 U.S. 48, 56 S. Ct. 78, 80 L.Ed. 35; Tait v. Safe Deposit & Trust Co. (Re Cate) 74 F.(2d) 851 (C.C.A.4); McCaughn v. Real Estate Land Title & Trust Co., 297 U.S. 606, 56 S.Ct. 604, 80 L.Ed. 879. The evidence fails to show that contemplation of death was an inducing cause either partial or dominant or controlling, for these transfers. In 1925 the decedent, David Myers, was a man only 62 years of age, in good health giving regular daily attention to his business and had just married a second wife. The testimony affirmatively shows that the inducing cause for the transfer of his half interest in the capital of the business to his son, grew out of the circumstances of his remarriage and his desire to assure his son the control of the business, and there is nothing to indicate that it was induced in part even by contemplation of death. And again there is positive testimony that the transfers of 1929 and 1930 were induced by the desire to make presently definite provision for his only grandchildren, and they were made at a time when he was also still in good health and daily occupied in his attention to his son's business. Nor is there any testimony in the case which in any way indicates affirmatively that at any time any of these transfers were actuated or motivated either by fear of or contemplation of death within the principles of the cases cited.

I therefore find as a fact that these transfers were not made in contemplation of death within the terms of the statute. Something will be said later on with regard to the later transfers, including those in 1933.

The defendant contends that even though there is no positive evidence to show that contemplation of death was in fact an inducing cause to the transfers, nevertheless the nature of the transfers, viewed in relation to the decedent's whole property and situation, was merely a substitute for testamentary disposition. In substance the argument seems in effect to seek to revive the contention (based on the language of the statute "intended to take effect in possession or enjoyment at or after his death"), that the reservation of a life estate made the transfers taxable. This contention, however, is foreclosed by May v. Heiner, 281 U.S. 238, 50 S.Ct. 286, 74 L. Ed. 826, 67 A.L.R. 1244; Burnet v. Northern Trust Co., 283 U.S. 782, 51 S.Ct. 342, 75 L.Ed. 1412; Morsman v. Burnet, 283 U. S. 783, 51 S.Ct. 343, 75 L.Ed. 1412; McCormick v. Burnet, 283 U.S. 784, 51 S.Ct. 343, 75 L.Ed. 1413; Helvering v. St. Louis Union Trust Co., 296 U.S. 39, 56 S.Ct. 74, 80 L.Ed. 29, 100 A.L.R. 1239; Becker v. St. Louis Union Trust Co., 296 U.S. 48, 56 S. Ct. 78, 80 L.Ed. 35; Tait v. Safe Deposit & Trust Co. (Re Cate), 74 F.(2d) 851 (C. C.A.4).

The next contention of the defendant is that the statute as amended in 1932 is retrospectively applicable to these transfers of 1925, 1929 and 1930. It is apparent from a reading of the statute that the language literally includes the transfers of 1929 and 1930 if the statute can properly be retroactively applied thereto. Quite different considerations, however, apply to the 1925 transfer. The important question is presented as to whether a retrospective application of the statute violates the due process clause of the Fifth Amendment.

As to this, in the first place, plaintiffs' counsel argue that, as a matter of construction, the statute should not be treated as retrospective. It is pointed out that taxing acts where ambiguous should be narrowly construed in favor of the taxpayer. Shwab v. Doyle, Collector, 258 U. S. 529, 42 S.Ct. 391, 66 L.Ed. 747, 26 A.

494

L.R. 1454; May v. Heiner, 281 U.S. 238, 245, 50 S.Ct. 286, 74 L.Ed. 826, 67 A.L.R. 1244; and that such Acts should be construed to avoid if possible a serious constitutional question. Reinecke v. Northern Trust Co., 278 U.S. 339, 348, 49 S.Ct. 123, 73 L.Ed. 410, 66 A.L.R. 397.

While these considerations are relevant, in my opinion both the wording of the 1932 Amendment and the history of the matter leading to its enactment, are inconsistent with the view that the statute can be construed prospectively only so far as its language is concerned. Subdivision (c) above quoted expressly provides for the inclusion in the gross estate of transfers which the decedent has made "at any time". Subsection (h) of the same section (26 U.S.C.A. § 411(h)) provides that subsection (c) "shall apply to the transfers * * '*. as severally enumerated and described therein, whether made, created, arising, existing, exercised, or relinquished before or after February 26, 1926."

As to the history of the legislation, it is to be remembered that the Treasury Department had long contended that transfers in trust in which the settlor reserved a life estate for his benefit were taxable. May v. Heiner, supra, decided April 14, 1930, was to the contrary but the general applicability of the decision was apparently not accepted as final by the Department. But on March 2, 1931, the Supreme Court by memoranda opinions decided the three cases of Burnet v. Northern Trust Co., Morsman v. Burnet and McCormick v. Burnet, supra, adversely to the Government on the authority of May v. Heiner, supra [see Tait v. Safe Deposit & Trust Co. (C.C.A.) 74 F. (2d) 851, 856]. Congress intervened the next day by passage of the resolution of March 3, 1931, evidently for the express purpose of changing the law in this respect at least for the future. The wording with respect to the particular type of transfers was "including a transfer under which the transferor has retained for his life or any period not ending before his death (1) the possession or enjoyment of or the right to the income from the property." It appears that the Commissioner interpreted the effect of this change in the law to be prospective only. But the Act of 1932 somewhat changed the phraseology and thereafter the Commissioner adopted the Treasury Regulation above referred to which in effect as applied to this case treated the statute as retrospective. Regulation 80, Art. 18(b).

On the question thus necessarily presented as to whether the statute can be applied retrospectively to the transfers in this case without violating the due process clause of the Fifth Amendment, I reach the conclusion that it cannot. It is unnecessary to elaborate the possible hardships to a taxpayer flowing from retrospective taxing statutes. They were forcibly stated in Shwab v. Doyle, 258 U.S. 529, 534, 42 S.Ct. 391, 66 L.Ed. 747, 26 A.L.R. 1454; and Nichols v. Coolidge, 274 U.S. 531, 542, 47 S.Ct. 710, 71 L.Ed. 1184, 52 A. L.R. 1081. In some particular situations such statutes have been upheld. See Milliken v. United States, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809; Saltonstall v. Saltonstall, 276 U.S. 260, 48 S.Ct. 225, 72 L.Ed. 565; Chase National Bank v. United States, 278 U.S. 327, 49 S.Ct. 126, 73 L.Ed. 405, 63 A.L.R. 388; Gwinn v. Commissioner, 287 U.S. 224, 53 S.Ct. 157, 77 L.Ed. 270; Burnet v. Wells, 289 U.S. 670, 53 S.Ct. 761, 77 L.Ed. 1439. But as applied to situations more nearly analogous to the instant case, retrospective taxing statutes have been held invalid. Nichols v. Coolidge, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184, 52 A.L.R. 1081; Shwab v. Doyle, 258 U.S. 529, 42 S.Ct. 391, 66 L.Ed. 747, 26 A.L.R. 1454; Union Trust Co. v. Wardell, 258 U.S. 537, 42 S.Ct. 393, 66 L. Ed. 753; Levy v. Wardell, 258 U.S. 542, 42 S.Ct. 395, 66 L.Ed. 758; Knox v. McElligott, 258 U.S. 546, 42 S.Ct. 396, 66 L.Ed. 760; Blodgett v. Holden, 275 U.S. 142, 276 U.S. 594, 48 S.Ct. 105, 72 L.Ed. 206; Untermyer v. Anderson, 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645; Coolidge v. Long, 282 U.S. 582, 51 S.Ct. 306, 75 L.Ed. 562. See, also, Tait v. Safe Deposit and Trust Co., 70 F.(2d) 79, 83 (C.C.A.4). See Retrospective Tax Laws by Neuhoff, St. Louis Law Review, Dec. 1935. But whatever doubt may have heretofore existed as to the validity of the retrospective taxing legislation here involved is completely dispelled by Helvering v. Helmholz, 296 U. S. 93, 56 S.Ct. 68, 80 L.Ed. 76, and White v. Poor, 296 U.S. 98, 56 S.Ct. 66, 80 L.Ed. 80, especially when read in connection with Helvering v. St. Louis Union Trust Co., 296 U.S. 39, 56 S.Ct. 74, 80 L.Ed. 29, 100 A.L.R. 1239; Becker v. St. Louis Union Trust Co., 296 U.S. 48, 56 S.Ct. 78, 80 L.Ed. 35, and Helvering v. City Bank Farmers Trust Co., Trustee, 296 U.S. 85,

56 S.Ct. 70, 80 L.Ed. 62, all decided on the same day, November 11, 1935. The Helmholz Case dealt with the application of subsection 302(d) of the Revenue Act of 1926, 44 Stat. 71. But the principle applied is directly applicable also to section 302 (c). It was said, 296 U.S. 93, on page 97, 56 S.Ct. 68, 70, 80 L.Ed. 76: "Another and more serious objection to the application of section 302 (d) in the present instance is its retroactive operation. The transfer was complete at the time of the creation of the trust. There remained no interest in the grantor. She reserved no power in herself alone to revoke, to alter, or to amend. Under the revenue act then in force, the transfer was not taxable as intended to take effect in possession or in enjoyment at her death. Reinecke v. Northern Trust Co., 278 U.S. 339, 49 S. Ct. 123, 73 L.Ed. 410, 66 A.L.R. 397. If section 302(d) of the Act of 1926 could fairly be considered as intended to apply in the instant case, its operation would violate the Fifth Amendment. Nichols v. Coolidge, 274 U.S. 531, 47 S.Ct. 710, 71 L. Ed. 1184, 52 A.L.R. 1081."

On this point the court was unanimous. Counsel for the defendant in this case attempts a distinction between the Helmholz Case and the instant one in that the decedent here reserved a life estate in the trusts created in 1929 and 1930. This circumstance is, however, not a materially differentiating factor between the cases because despite it the transaction was not taxable when made and was irrevocable and completely consummated. Furthermore the same ruling as to the invalidity of retrospective operation of the statute was made in White v. Poor, decided the same day, where the decedent did reserve a partial personal interest for life in the trust created.

With respect to the 1925 transfer there is also the very serious question as to whether it fairly falls within the language of the Act of 1932 reading—"or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from the property." 26 U.S.C.A. § 411 (c). The agreement which evidenced this transfer has already been reviewed. It provided for (1) termination of the partnership; (2) engagement of the business services of David Myers, for the period of his life, unless sooner terminated voluntarily or involuntarily; (3) compensation in the form of salary and one-half of the business while so engaged and (4) after the termination of the employment $3,600 a year for life out of the profits of the business. The only thing that David Myers transferred was his partnership capital of $60,000. In exchange for this transfer he received an agreement from the new sole owner of the business to compensate him for services on the basis of his previously received salary and one-half of the net profits of the business. It is at least doubtful under the testimony as to the nature of this business whether this condition for payment of future services can fairly be considered income on the capital transferred. Testimony in the case as to the nature of the business shows very clearly that profits to be realized from the business depended from year to year on the energy and activity of the parties who conducted it. Of course the capital was more than a negligible factor but the income from the business was dependent on the activities of its personnel and to be realized from successful salesmanship as to volume and price of sales and careful selection and supervision of credits. The human factor was certainly under the testimony more important than the capital invested. The nature of the business involved no special privilege or monopoly but, consisting of a wholesale shoe business, was subject to the keenest competition. That it was successful and made profits in every year but one (where the loss was small) since 1929, is highly persuasive of the view that the earning capacity was more largely attributable to personal activity than to invested capital.

Even if the language of the Act of 1932 could fairly be said to cover this kind of a transfer, and if it could be made retrospectively operative, it is still more difficult to justify the valuation of the transfer as made by the Commissioner at $166,000. All that was actually transferred by David Myers was $60,000 worth of property being his then capital interest in the business, and the consideration given by Elkan Myers for this was an agreement to pay not less than $3,600 a year from the profits of the business to his father for life. The valuation as made by the Commissioner proceeded on the theory that the time of the valuation was the date of the decedent's

death. And the basis of the valuation as then made included the subsequent transfers made by David Myers to his son which have been above enumerated, amounting in all to $122,000, and which had been reinvested by Elkan in the business. And in reaching his valuation the Commissioner attributed substantial value to the alleged good will of the business in accordance with a formula thought to be fairly applicable to the case. While of course it is not doubted that good will as such may be a very important and material factor in reaching a fair valuation for some particular business, the testimony in this case satisfies me that it was a factor of little importance in this particular business which, as already stated, was principally dependent upon personal salesmanship and management. Nor was there any justification for including in the valuation of the 1925 transfer, the subsequent transfers amounting to $122,000. They were clearly separate and independent transactions, the inclusion of which depended upon other considerations than the circumstances of the 1925 transfer. It is difficult to see on what proper theory the 1925 transfer could have been valued at more than $60,000 and in view of the consideration given therefor, its proper valuation was clearly less than that. It is, however, unnecessary to further pursue the discussion of this point as I have reached the conclusion that the 1925 transfer was not properly included in the gross estate.

■ It remains to consider whether any or all of the subsequent transfers amounting to $122,000 should be included in the gross estate. Each of them was a separate transaction represented by an outright gift of the respective amounts. While there are circumstances of similarity in common to all, there are some differences between the two transfers in 1933 and the earlier ones. The only question as to each of them is whether the circumstances are such that contemplation of death was a substantially impelling motive therefor. With the possible exception of the transfer of $45,000 on December 30, 1933, there is no testimony that nearness of death or the fear of death as being close at hand was the motivating cause for the transfers. But as pointed out in the Wells Case, supra, the statutory provision is not limited to this particular condition because it is gratified if contemplation of death in a broader sense was the inducing cause. Each

transfer was an outright gift of money, fully consummated, irrevocable and unconditional and absolute. It was evidently induced by the affection of a father for an only son, with the former's appreciation that the money had largely been earned by the latter's energy and business ability; and represented an accumulation of credits to the father for his services beyond his reasonable needs; and (with the exception of the gift of December 30, 1933) they were made at times when the father was not in any critical condition of bad health and not actuated by fear or thought of death. The circumstances are referable rather to current affairs of life and business, than to a testamentary disposition. Without further particular analysis of the testimony, I reach the conclusion as a matter of fact that the transfers of September 20, 1928, in the amount of $25,000; of July 2, 1929, in the amount of $20,000, and of January 26, 1931, in the amount of $12,000 were not made in contemplation of death as thus understood in the broader sense.

■ The question is, however, a closer and more difficult one with respect to the transfers of January 7, 1933, in the amount of $20,000 and of December 30, 1933, in the amount of $45,000. Here the two-year prima facie presumption in favor of taxability is directly applicable and the burden of proof is clearly upon the plaintiffs to overcome the statutory presumption by a preponderance of testimony which affirmatively establishes that the motivating cause or inducement for the transfers was something other than contemplation of death. It was said by the Chief Justice in the Wells Case: "The natural and reasonable inference which may be drawn from the fact that but a short period intervenes between the transfer and death is recognized by the statutory provision creating a presumption in the case of gifts within two years prior to death." The statutory presumption is, however, a rebuttable one. It exists only until the contrary is shown by affirmative testimony. United States v. Wells, 283 U.S. 102, 117, 51 S.Ct. 446, 451, 75 L.Ed. 867; Heiner v. Donnan, 285 U. S. 312, 52 S.Ct. 358, 76 L.Ed. 772. See, also, Jefferson Standard Life Ins. Co. v. Clemmer (C.C.A.4) 79 F.(2d) 724, 103 A. L.R. 171.

■ With regard to the transfer of $20,000 on January 7, 1933, bearing in mind the then state of David Myers' health, his

current regular attention to business, and his prior policy with respect to his unneeded credits from the business, and the other testimony as indicating his probable motive or state of mind, inducing the gift, I reach the conclusion of fact on the affirmative testimony that the transfer was not made in contemplation of death.

But the situation was different on December 30, 1933. He had then made his will dated February 28, 1933, by which he had specifically bequeathed any credits to him in the business to his son, Elkan, his health had definitely failed, he was no longer able to attend to business, and his death occurred in 32 days. It is admitted that the transfer of $45,000, nearly one-half of his then remaining whole estate, was made in advance of the time that would have been in accord with his customary policy as to his credits in the business. The only motivating cause for the transfer at the particular time, other than the general policy of the decedent to make transfers from time to time to his son of profits from the business not needed for the father's own use, is the suggestion that the particular transfer was made at the end of the year of 1933 because of the possibility that the rates of the gift tax then again in force might be increased effective for the next calendar year. While this consideration may have existed and played some part in the transfer then made, the importance of its relation to the transfer is not impressive under all the circumstances. On the whole I reach the conclusion that the positive and affirmative testimony submitted by the plaintiffs is not sufficient to overcome the statutory presumption with respect to this transfer of $45,000 on December 30, 1933. This amount of $45,000 should therefore properly have been included by the Commissioner in the valuation of the gross estate.

The remaining question arises on the set-off claimed by the defendant for the alleged non-payment of the gift tax in the 1925 transfer. The amount claimed, $259.54, is arrived at by applying the provisions of the Gift Tax Act of 1924, c. 234, §§ 319–324, 43 Stat. 313, to the Commissioner's valuation of the 1925 transfer which he made at $125,000. It was conceded, however, that if the proper valuation of this transfer was less than $50,000, then no tax was due. After considering the testimony on this point I have reached the conclusion that, in view of the consideration given by Elkan Myers for the transfer of $60,000, the net value of the transfer was so reduced that no tax was due under the Act. The claim for set-off is, therefore, disallowed.

Counsel have submitted a number of specific prayers or requests for instructions as to the law in the case. To the extent necessary I have ruled upon these in accordance with the principles herein announced and have filed them with the clerk. Any exceptions desired to be taken should be promptly filed.

Counsel should also agree if possible upon the amount of the verdict to be calculated in accordance with the principles herein announced; failing that agreement, they should respectively promptly submit computations therefor. And thereafter a verdict for the appropriate amount will be separately entered.