## TONKIN et al. v. UNITED STATES.
### Civil Action No. 2765.

District Court, W. D. Pennsylvania.
Sept. 11, 1944.

Patterson, Crawford, Arensberg & Dunn, James S. Crawford, Charles F. C. Arensberg, and Ella Graubart, all of Pittsburgh, Pa., for plaintiffs.

Charles F. Uhl, U. S. Atty., of Pittsburgh, Pa., Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe and Leland T. Atherton, Sp. Assts. to Atty. Gen., for the United States.

GIBSON, District Judge.

The Court, after hearing and consideration, makes the following Findings of Fact and Conclusions of Law:

Findings of Fact

1. The stipulation of facts, filed with the Court on June 14, 1944, is here adopted, now referred to and made a part hereof.

2. On December 3, 1936, when John B. Tonkin transferred 2,204 shares of the common stock of the Standard Oil Company of New Jersey to the Peoples-Pittsburgh Trust Company as trustee, he was in good health and looking forward to the enjoyment of life after his retirement as President of the Peoples Natural Gas Company. He played golf regularly, he liked travelling, and often expressed confidence that he would outlive his father, who died at ninety-two.

3. One of Tonkin's intimate friends was his family doctor, Dr. MacMurray, who examined him frequently. While Tonkin had had a valvular heart leak from childhood, Dr. MacMurray did not consider it serious and indeed never told Tonkin about it. During MacMurray's association with him Tonkin was never seriously ill except for an attack of appendicitis about twenty-five years ago.

4. John B. Tonkin for more than forty years was connected with the Standard Oil Company of New Jersey and with its subsidiary, the Peoples Natural Gas Company, of which he was President. In 1935 he was eligible for retirement under the pension plan of Peoples Natural Gas Company. But because of the launching of a new enterprise in which he was interested, he postponed retirement until February 1, 1936. He looked forward to a period of leisure following his retirement.

5. After his retirement he maintained an office in the Peoples Gas Building for which he bought new furniture and equipment.

6. He was a Director of the Peoples-Pittsburgh Trust Company and attended the meetings of its Board and Executive Committee faithfully. He was also a Director of the Passavant Hospital and was a member of several business and social organizations.

7. In 1935 to 1936 he built and furnished a large house at Madison, Ohio, at a cost of about $32,000. During the winters he went to Florida and during the summers he stayed at his house in Madison, where he played golf frequently and led an active outdoor life. On his customary trip to Florida in the winter of 1940 he contracted pneumonia and died.

8. Tonkin had acquired during the many years he was connected with the Standard Oil Company of New Jersey and its subsidiary more than 10,000 shares of Standard Oil Company of New Jersey stock. He knew his holdings were too large and felt the need of diversifying his investments. In addition the situation with respect to the expropriation by the Mexican Government of foreign oil properties was another reason why he felt it was necessary to divest himself of some of his Standard Oil Company stock. Standard Oil Company stock was very high in the latter part of 1936.

9. He discussed this need for disposing of some of his holdings in Standard Oil Company stock with Gwilym Price (then Vice President in charge of trusts of the Peoples-Pittsburgh Trust Company) with whom Tonkin had been associated as a Director in the management of the affairs of the Trust Company. He also discussed the desirability of selling a considerable portion of Standard Oil Company stock with Joseph S. Mason, who was an insurance broker, and told his brother, Loring Tonkin, that he, Tonkin, ought to sell some of his Standard and buy something else.

10. As a result of his discussions and in view of his circumstances and experience Tonkin decided to invest in annuities, thus giving him a substantial investment unrelated to his Standard Oil Company stock. The investment in the annuities had the added advantage of reducing his Federal income tax and his state personal property tax in that the payments received on the annuities were partially a return of principal and to that extent not taxable.

11. On December 3, 1936, when Tonkin made the deed of trust and transferred 2,204 shares of Standard Oil Company stock to the trustee, the stock was higher than it had been for many years. If Tonkin had sold the stock himself, he would have had a large capital gains tax to pay, whereas by transferring the stock to a trustee, the taxable gain to the trustee would be very much less, and the trustee in paying income taxes would be in a much lower bracket than Tonkin himself.

12. The letter of December 9, 1936, written by May S. Tonkin to the Peoples-Pittsburgh Trust Company, instructing the

trustee to purchase single premium life insurance policies, was her voluntary act. There is no evidence that she was not a free agent in determining whether or not she wished to take this action.

13. The annuities purchased by Tonkin were complete transactions in themselves and did not depend upon any action taken either by his wife or by the trustee. They did afford an opportunity for the purchase of single premium life insurance policies, but whether or not such single premium life insurance policies were purchased did not in any way affect the annuities.

14. The purchase by Tonkin of annuities was not contingent or dependent upon the exercise by his wife of the right given her under the trust agreement to require the trustee to purchase single premium life insurance policies.

15. The purpose of John B. Tonkin in creating the trust of December 3, 1936, was to effect a savings in income tax on capital gains, and to reduce his income and personal property taxes. The total savings for the years 1936 to 1939 were $9,126.04.

16. Contemplation of death was not an impelling motive for the gifts made by Tonkin in 1936.

17. The gifts made by Tonkin in 1936 were not transfers intended to take effect at or after his death.

18. The impelling motive of Tonkin in purchasing annuities was not to enable the trustee named in the deed of trust of December 3, 1936, to purchase single premium life insurance policies on his life, if the trustee was requested to do so by Mrs. Tonkin.

19. The following Certificate of Death was filed in Florida after the death of John B. Tonkin:

Certificate of Death

Florida

State Board of Health
Bureau of Vital Statistics

State File No. xxx
Registrar's No. 46

This is a true Local Registrar's Copy (Seal)
(Signed) Lurana A. Pohzehl Local Registrar V. S. Dist. 11-09
Deputy Clerk & Deputy Local Registrar

1. Place of Death:
    (a) County  Dade
    District No.  11-09
    (b) Precinct  xxxxx
    (Write name, not number)
    Precinct No.  xxxxxx
    (c) City or Town  Miami Beach
    City or Town No.  11-552
    (d) Name of hospital or institution  3301 Collins Ave.
    (If not in hospital or institution, write street number or location)
    (e) Length of stay: In hospital or institution  xxxxxx
    At place of death  2 weeks
    (Specify whether years, months or days)

2. Usual Residence of Deceased:
    (a) State  Penn.
    (b) County  Allegheny
    (c) City or Town  Pittsburgh
    (If outside city or town limits, write Rural)
    (d) Street No.  5863 Marlboro St.
    (If rural, give location)
    (e) Citizen of Foreign country?  xxxxxx
    yes or no
    if yes, name country  xxxxxx

3. Full name of Deceased  John Barnett Tonkin

3. (a) If veteran
    name war  None
    3 (b) Social Security
    No.  None.

4. Sex  Male                          5.  Color or race  white

Single, married, widowed or divorced  Married

6. (a)  If married, widowed or divorced, husband of (or)
         · wife of     May Simpson Tonkin

6. (b)  Age of husband or wife, if alive  63 years

7. Birth date of deceased  Sept. 20, 1875

        (month)  (day)  (Year)

8. Age:   Years ·   Months     Days    If less than one day
          63                                   hrs.          min.

9. Birthplace  Tidionti                 Penna.
        (City, town or county)        (State or foreign country)

10. Usual occupation  Retired

11. Industry or business  Executive

12. Name—Father—  John Tonkin

13. Birthplace  Penna.

14. Maiden name—Mother—  Margaret Barnett

15. Birthplace  St. Louis, Mo.

16. Informant's Signature (Signed)  Mrs. May Tonkin

16 (a).  Address  Pittsburgh, Pa.

17. Burial, cremation or removal?  Removal

17 (a).  Date  1/27/40        17 (b)  Place  Pittsburgh, Pa.

18. Funeral Director's Signature  W. L. Philbrick

18 (a).  Address  Miami, Fla.

19. Filed  1/26  1940           Clara P. Bennett
                               Deputy  Local Registrar

Medical Certification.

20. Date of Death:   Month  Jan.       Day  26
       Year  1940    hour  1    Minute  P. M.

21. I hereby certify that I attended the deceased from Jan. 14, 1940 To Jan.
    26, 1940; that I last saw him alive on Jan. 26, 1940; and that death
    occurred on the date and hour stated above.

                                        Duration

Immediate cause of death
   Coronary thrombosis              few minutes

Due to Auricular fibrillation     4 yrs.

Due to  xxxxxx

Other conditions  xxxxxx
                  (Include pregnancy within 3 months of death)

Major findings:
of operations  xxxxxx

xxxxxx

(Give date of operation)

of autopsy  None

Underline the cause
to which death
should be charged
statistically.

22. If death was due to external causes, fill in the following:

(a) (Probably) Accident, suicide, homicide (specify)  xxxxx

(b) Date of occurrence  xxxxxx

(c) Where did injury occur?  xxxxx

(City or town)      (County)      (State)

(d) Did injury occur in or about home, on farm, in industrial place, in public place?  xxxxx

(Specify type of place)

While at work?  xxx          (c) Means of injury  xxxxx

23. Signature (Signed)    W. R. Thompson  M. D.

(a) Address  835 Lincoln Rd.    Date Signed.  1/26/40

D—1

## Conclusions of Law

I. The transfers of 2,204 shares of Standard Oil Company stock and the policies of life insurance by Tonkin on December 3, 1936, to the trustee were not made in contemplation of death within the meaning of Section 302(c) of the Revenue Act of 1926 as amended, 26 U.S.C.A. Int.Rev. Code, § 811(c), and consequently should not have been included in the gross estate by the Commissioner.

II. The transfers were not made to take effect in possession or enjoyment at or after death within the meaning of Section 302 (c) of the Revenue Act of 1926 as amended and consequently should not have been included in the gross estate by the Commissioner.

III. The Commissioner erred in including in the gross estate the proceeds of the policies in the amount of $238,803.76.

IV. The letter of December 9, 1936, which May S. Tonkin wrote to the trustee requesting it to purchase policies of life insurance was freely and voluntarily written by her, and there is no evidence that she had any understanding or agreement with her husband to write the letter, or that she was under the influence of her husband or that he requested or coerced her in any way to request the trustee to purchase single premium life insurance policies.

V. Under the terms of the trust agreement of December 3, 1936, it was in the discretion of the trustee to purchase life insurance, to convert the life insurance into other investments, and the trustee was under no obligation to retain any policies of life insurance purchased by it pursuant to a request to do so by May S. Tonkin.

VI. Since the decedent died on January 26, 1940, at which time he had no incidents of ownership in the policies described in Schedule A, the proceeds of such policies are not includible in the gross estate and are not taxable under 811(g).

VII. The plaintiffs are entitled to recover the amount of $45,930.95, with interest.

## Discussion

Plaintiffs filed an estate tax return with the Collector of Internal Revenue and paid the amount calculated thereon, viz. $84,120.68, based on a gross estate of $688,844.31. Thereafter a deficiency was assessed in the amount of $44,282.37, based on a claim that the gross estate was $918,971.32. The deficiency assessment contained an addition of interest from April 26, 1941 to May 20, 1942. The total of the assessment was paid under protest. After adjustment in the office of the Commissioner of Internal Revenue the final amount of the overpayment, as alleged by plaintiffs, was fixed at $45,930.95, which amount plaintiffs now claim with interest.

The assessment of the Commissioner of Internal Revenue was based upon the addition to the total estate of John B. Tonkin, as reported, of $200,042.98, the proceeds of

a single premium life insurance policy purchased by a trustee under an inter vivos trust with the proceeds of securities irrevocably transferred by John B. Tonkin on December 3, 1936, and also the sum of $38,760.78, the proceeds of three life insurance policies absolutely assigned under the same trust agreement, and an item of cash in the trust fund. The theory of the Internal Revenue Bureau, upon which it based the addition to the estate was that the trust fund had been created by John B. Tonkin in contemplation of death within the provisions of Section 811(c) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 811(c).

The death of John B. Tonkin occurred in January of 1940, about a month more than three years after the trust agreement had been executed. The Commissioner of Internal Revenue, therefore, in assessing the additional tax was not acting pursuant to the rebuttable statutory presumption that any transfer of property within two years of death was in contemplation of death. That period had passed.

Mr. Tonkin, when the trust in question was established and until about one month before he went to Florida (after which the witnesses did not see him), as some six credible witnesses have testified, was in apparently excellent health and in enjoyment of life. He had retired on February 1, 1936, as President of the Peoples Natural Gas Company, a Standard Oil subsidiary. After his retirement he expected to enjoy himself in the future. He built a house on Lake Erie at a cost of $32,000, and also furnished an office for his personal use. When at the Lake Erie house in the summer he played golf regularly, and in the winter he went with his wife to Florida. His father had lived to be over ninety years of age, as had other members of the same generation of his family, and this fact, joined to his own expressions and his enjoyment of his leisure, justified the belief on his part of a long life.

■ Despite the expectations of himself and his friends in December of 1940, when in Florida, he contracted pneumonia and died. The court, over objection of counsel for plaintiffs, has admitted a death certificate made out by a Florida physician, which recited that death was due to "coronary thrombosis due to auricular fibrillation —four years." That this certificate should be given weight for anything beyond the immediate cause of death seems impossible in view of the other testimony. The certificate maker was never examined to determine what, if any, was the source of his information. He may have argued from result to cause; or he may have received information from one who did not understand the terms of the questions put to him, and that person not necessarily the patient. From the testimony offered by the plaintiffs it is quite plain that the deceased did not have an auricular fibrillation—a twitching heart—for four years. Particular attention may be called to the testimony of Dr. MacMurray, a physician of unquestioned standing, who was the personal friend and physician of the Tonkin family. He had examined John B. Tonkin about a month before his death, and found no evidence of auricular fibrillation. He knew that Mr. Tonkin had a slightly leaking heart, which probably dated back to a childhood disease, but he did not regard it as particularly serious and had not desired to create undue alarm by even discussing its existence with his friend, although he had mentioned it to his wife. That he did not pay any special attention to it is apparent from the fact that he continued to play golf with Tonkin. Had the latter exhibited shortness of breath and weakness, the characterizations of the disease in its later stages, it is inconceivable that Dr. MacMurray would have allowed the exertion; and it is equally inconceivable that Tonkin would have felt inclined to persist in it. If the fibrillation existed at all, it is plain that it followed the pneumonia rather than that it existed prior thereto as a warning of impending death. Dr. W. F. Bloom, a witness called by the Government, testified: " * * * auricular fibrillation is usually found in cases following some infection or subjective condition, like pneumonia, meningitis, rheumatism * * *." Assuming that a person had auricular fibrillation (he had never seen Tonkin), he said: "He couldn't help but know he had ill health, because auricular fibrillation is the end result rather than the beginning." Prior to his trip to Florida, it is quite plain that Tonkin had no warning of closely impending death. His actions and apparent zest in life contradicted it.

■ Contemplation of death, however, may exist and may invalidate transfers of property, even though fear of immediately impending death be not present. United States v. Wells, 283 U.S. 102; 51 S.Ct. 446, 75 L.Ed. 867. In each case the circumstances must be examined to determine the

motive of a donor in the light of his bodily and mental condition.

When John B. Tonkin transferred the Standard Oil stock and insurance policies to the Trustee, which transfer is now claimed by the Government to have been made in contemplation of death, he was aged sixty-one years. While that age was beyond the period of youth, it still was not an extreme old age such as existed in Helvering v. Le Gierse, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996. In that case the woman whose transaction was questioned was aged 80 years and died within a few months after the transfer. In such case the age in itself would carry with it at least a strong suspicion that any action had been taken in contemplation of death. But John B. Tonkin was not of such extreme age. The uncontradicted testimony of those coming in contact with him at that time was that he was in good health and interested in the affairs of life. All his actions immediately before and at the time of the creation of the trust were such as were natural to one who expected a long life and who intended to relieve himself of all future anxieties. True, counsel for the Government calls attention to the fact that Tonkin executed a will very shortly after the trust agreement, and urges that action as tending to establish his contemplation of death. It does, in fact, establish a contemplation of death, but not the contemplation considered by the tax statute, viz., the ultimate death which all must contemplate. The will, considering the testimony as to his physical and mental condition at the time, was but another step to enable him to enjoy his leisure without thought of the future. In United States v. Wells, supra, the court considered a will of a much older man than Tonkin and made when the testator was quite ill, and when the interval between its execution and death was shorter, and held that the will, in view of the other facts of the case, did not establish the statutory contemplation.

The main argument of counsel for the Government upon which he bases his claim that the trust agreement was a mere testamentary device is found in this provision of the agreement: "Particularly, the Trustee shall purchase single premium insurance upon the Insured's life if directed to do so by the Insured's wife." John B. Tonkin, about the time of the trust agreement, purchased annuities, and later the Trustee purchased single premium life insurance policies upon his life at the request of Mrs. Tonkin, pursuant to the provision in the trust agreement, supra. The purchase of the annuities by Tonkin permitted the issuance of the single premium life policies without a physical examination of annuitant. Counsel for the defendant contends that the trust agreement, the purchase of the annuities and the acquisition of the life policies constituted one transaction, in effect. He asserts that Mrs. Tonkin was under the control of her husband, and that the effect and purpose of the procedure adopted was to have the transfers of 1936 take effect in possession or enjoyment at or after death. This contention overlooks the power of the trustee under the agreement, the fact that no proof whatsoever establishes control of Mrs. Tonkin by her husband, and ignores the fact that the agreement enabled Tonkin to reduce his excessive holdings in one stock, and also to legitimately save ultimate capital gains tax and to save in income tax by the division of his estate. By the annuity he also provided himself with a certain amount of fixed income.

Counsel for the plaintiffs has cited a case recently decided by the United States Board of Tax Appeals, Fidelity-Philadelphia Trust Company and Ora E. Dundore, Executors, v. Commissioner of Internal Revenue, not reported, but found in C. C. H. It is practically the same in substance as the instant matter. Instead of the irrevocable delivery of the stock and insurance policies under the trust agreement, as in this case, the husband of the deceased, 71 years of age, gave his wife $85,000 in cash. Prior thereto the husband, Charles R. Dundore, had obtained an annuity under which he was entitled to $233.01 per month. About one year later the wife made application to the insurance company for a single premium life insurance policy, which the husband also signed as the insured. The policy, as those in the instant case, was issued without any physical examination, by reason of the existence of the annuity. As in the instant case, the Government asserted that the transaction disclosed a gift to take effect at death, because the insurance company would not have issued the single premium policy without the annuity contract. The decedent had died about eleven months after the policy issued. The Board of Tax Appeals held that the gift to the wife had been completed and that her action was independent of that of her husband.

The gift in the instant case was unquestionably complete and irrevocable, and no testimony appears to disclose that Mrs. Tonkin was not acting independently in requesting the trustee to purchase the single premium policies. Nor does it appear that the Trustee had agreed to any surrender of its powers under the trust agreement. With this absence of testimony joined to the testimony as to the physical and mental condition of John B. Tonkin when the trust was created, the court feels that the addition to the estate tax by the Commissioner was unjustified, and that judgment must be in favor of plaintiffs.