**BELL et al. v. UNITED STATES.**

Civ. No. 1087.

District Court, D. Minnesota, Third Division.

Nov. 7, 1947.

Patrick J. Ryan, of St. Paul, Minn., for plaintiffs.

Victor E. Anderson, U. S. Atty., Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., Paul S. McMahon, Sp. Asst. to the Atty. Gen. (Theron L. Candle, Asst. Atty. Gen., and Andrew D. Sharpe, Sp. Asst. to the Atty. Gen., on the brief), for defendant.

BELL, District Judge.

This is an action under Section 24(20) of the Judicial Code, 28 U.S.C.A. 41(20), by the executrices of the will of Daniel L. Bell, deceased, who died testate St. Paul, Minnesota, on March 15, 1944. It seeks recovery of $55,615.84 paid to the Collector of Internal Revenue on March 8, 1945, as additional federal estate taxes.

Daniel L. Bell, the deceased, was a resident of St. Paul for many years. In his will he nominated his sisters Minnie A. Bell and Nellie V. Bell to be executrices. The will was admitted to probate in the Probate Court of Ramsey County and the sisters, who are the plaintiffs herein, became the qualified and active executrices and they now are acting as such.

The plaintiffs duly filed with the Collector of Internal Revenue their federal estate tax return disclosing a liability of $101,607.52 which was paid to the Collector. On February 28, 1945, the Commissioner of Internal Revenue determined a deficiency in the estate tax liability of $55,720.76 which the plaintiffs paid on March 8, 1945. The plaintiffs filed a claim for refund on April 16, 1945, in the sum of $55,615.84. This claim was rejected by the Commissioner on February 25, 1946.

A deficiency of $55,615.84, the amount of the claim for refund involved in this suit, was attributable to the inclusion in the gross estate of the value of the corpora of the two trusts which the decedent had created in 1935, each of the sisters being named the beneficiary of one of the trusts. These trusts were terminated by the decedent in 1943 by distributing to his sisters the bonds which constituted the principal of the two trusts. The Commissioner included the value of the bonds in the gross estate for tax computation on the grounds that the transfers and the termination of the trusts were in contemplation of death. The deficiency assessment included $104.92 for minor adjustments not here involved.

After rejection of the claim for refund, this action was timely commenced on April

1, 1946. The case was tried without a jury at the April 1947 term of this court.

The trust instruments[1] were identical in all their provisions except the beneficiaries and the character and amounts of the principal of the trust funds. The deceased gave for the benefit of Minnie United States Treasury 4% bonds of the value of $115,-840, and he gave for the benefit of Nellie United States Treasury 3% bonds of the value of $103,240 as of July 16, 1935, the date when the trusts were created.

The decedent had executed his last will and testament[2] on January 2, 1935, in which he gave his entire estate to the two sisters. The decedent on May 10, 1943, wrote a letter[3] to his sisters pertaining to the termination of the trusts. The sisters accepted receipt of the bonds as shown by the signatures of the three to the letters acknowledged before a notary public.

The existence of the two trusts were disclosed in the estate tax return but their values were not included as a part of the

---

[1] The material provisions are:

1. "To hold as trustee and manage the said property, and demand, collect and receive the income, profits, interest and dividends thereon, pay the expenses of administering the trust and of maintaining and protecting the trust estate and invest and reinvest the same in such class or form of securities or investments as the trustee may in his discretion deem best, and to pay and distribute the income and principal thereof as herein provided.

2. "To pay all the net income of the trust estate annually to the said Minnie A. Bell.

3. "The trust herein created shall be and remain in full force and effect until my death, or until the death of the beneficiary, Minnie A. Bell, whichever event shall sooner occur. Upon my death, the said Minnie A. Bell surviving me, this trust shall cease and terminate and all the property then in the trust estate shall be paid and delivered over to the said Minnie A. Bell.

"Should the said Minnie A. Bell predecease me, then upon her death this trust shall cease and terminate and all of the property then in the trust estate shall be paid and delivered over to such person or persons and in such manner as she, the said Minnie A. Bell, by her last will and testament duly admitted to probate in the Probate Court of Ramsey County, Minnesota, shall appoint, provide and direct; and, in default of such duly probated will, then to the heirs at law of said Minnie A. Bell, in accordance with the laws of Minnesota providing for the distribution of property of persons dying intestate.

"So long as the Donor, D. L. Bell, shall act as trustee or co-trustee of this trust he shall have the power, in his absolute discretion, to distribute all or part of the principal of the trust estate to the beneficiary, Minnie A. Bell, at any time prior to its termination by its terms. It is hereby expressly pro-

vided that the Donor is not a beneficiary under this trust."

[2] "First: I will and direct that the executrices hereinafter named first pay all my just debts and funeral expenses as soon after my death as conveniently may be done.

"Second: All the rest, residue and remainder of my property, of every kind and nature, real, personal and mixed, which I now own and which I may hereafter acquire, I give, devise and bequeath to my sisters, Minnie A. Bell and Nellie V. Bell, to be theirs absolutely to each one half thereof. If either of my sisters shall not survive me, then all of my said property shall go to the survivor, to be hers absolutely.

"I have great confidence in the officers of the First Trust Company of Saint Paul, and I request my said sisters to consult with said officers of said Trust Company concerning any problem which may arise and confront them in the management of property herein bequeathed and devised them, and to exercise their judgment in the management thereof in the light of the advice so obtained.

"Lastly, I nominate and appoint my said sisters, Minnie A. Bell and Nellie V. Bell, or the survivor thereof, to be the executrices of this my Last Will and Testament, and I request they be not required to furnish any probate bond."

[3] "You will recall that I stated to you a year or longer ago that there wasn't any reason for keeping the two trusts of July 16, 1935, in force any longer because you were taking care of the bonds yourselves and collecting the income thereon, as we agreed you should when we talked about it early last year."

"Mr. Hoeschen advises me that we should sign this statement declaring the trusts terminated as of December 31, 1942, and that I have distributed the $100,000 principal of bonds in each trust to each of you, respectively, in accordance with the second paragraph on page 2 of each trust instrument."

taxable estate. A recital in the return follows: "Decedent's purpose was to equalize wealth with sisters with whom he had lived and counselled all his life, all three being unmarried." The claim for a refund[4] asserts that the transfers and creation of the trusts were not in contemplation of death. It does not state decedent's motive in terminating the · trusts and distributing the funds. On further consideration of the case after the claim for refund was filed, the Internal Revenue agent in charge advised the representative of the estate by letter dated May 25, 1945, that the claim would be recommended for disallowance. A statement[5] was enclosed with the letter giving the reasons for disallowance. The Commissioner in a letter[6] of rejection stated that the termination of the trusts was in contemplation of death.

Two questions are involved as follows: (1) whether the creation by the decedent in 1935 of the two trusts, with each of his sisters the beneficiary of one, was in contemplation of death within the meaning of Section 811(c) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 811(c); and (2) whether the termination of the trusts by the decedent in 1943 was in contemplation of death within the meaning of Section 811(d) (2) and (4) of the Internal Revenue Code.

Section 811 of the Internal Revenue Code[7] 26 U.S.C.A. Int.Rev.Code, § 811, applies.

4 "Each sister then owned in her own right securities worth approximately $125,000. Daniel L. Bell's financial worth then was about $650,000. In approximately doubling the wealth of each of his sisters, he would have had to consider, if he had estate taxes in mind, that he might be creating a potential estate tax liability, or liabilities, which would not up to then have existed, and he would have had to consider that one or both of his sisters was likely to die before he did. Of course, he might have calculated the greater impact of taxes upon his estate than upon theirs, but the fact remains that there existed a definite likelihood that his gifts would result in a greater estate tax contribution to the government than if none were made. It is submitted that in the circumstances here existing, particularly among people of the ages here involved, these gifts were not made in contemplation of death and were not made in avoidance of estate taxes."

5 "Statement"

"The question of transfers in contemplation of death is not only considered in the light of the decedent's motives in 1935 when trusts were created, but more especially the motives in May 1943 when assets were distributed and trusts terminated."

"If the trusts had been in force at the date of decedent's death, the value thereof would have been includible in the estate under the provisions of Regulations 105, Section 81.20, as he held the power to 'terminate' the trusts. It was held in the case of Mellon v. Driscoll [3 Cir.], 117 F.2d 477, that a power to terminate a trust and vest the corpus in the beneficiaries constituted a taxable transfer where such power was not exercised."

"Sec. 81.21 of Regulations 105 provides that if a power to alter, amend, revoke, or terminate a transfer is relinquished within two years prior to decedent's death, such action shall be deemed, unless shown to the contrary, to have been in contemplation of death."

6 "The claim seeks the refund of the above-mentioned amount based on the contention that two of the gifts of the value of $210,080.00 made by the decedent were not made in contemplation of death or includible in his gross estate. The two trusts, which are identical in terms, provide that the income shall be paid to the beneficiaries annually; that the trusts shall exist until the death of the decedent or the beneficiaries, whichever event shall occur first; if the beneficiaries survive the decedent, the assets shall be delivered to them; in the event that the beneficiaries predecease the decedent the assets shall be paid and delivered to the person or persons each beneficiary shall by law appoint; if the beneficiaries die intestate, disposition shall be in accordance with the laws of Minnesota; and so long as the decedent acted as trustee or cotrustee he had the power in his absolute discretion to distribute all or part of the principal of the trust estates to the beneficiaries at any time prior to their termination by their terms. The Bureau holds that the relinquishment of the decedent's powers, his termination of the trusts, was made in contemplation of death. In view of the foregoing circumstances, the Bureau is of the opinion that the assets of the trusts were includible in the decedent's gross estate under the provisions of sections 811(c) and (d) of the Internal Revenue Code."

7 "Sec. 811. Gross Estate.

"The value of the gross estate of the decedent shall be determined by including

Treasury Regulations 105, promulgated under the Internal Revenue Code,[8] apply.

The donor's motive is determinative of whether a gift inter vivos was made

the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

\* \* \* \* \* \* \*

(c) Transfers in Contemplation of, or Taking Effect at Death. To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death. \* \* \*

(d) Revocable Transfers

\* \* \* \* \* \* \*

(2) Transfers on or Prior to June 22, 1936. To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation of his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Except in the case of transfers made after June 22, 1936, no interest of the decedent of which he has made a transfer shall be included in the gross estate under paragraph (1) unless it is includible under this paragraph;

\* \* \* \* \* \* \*

(4) Relinquishment of Power in Contemplation of Death. The relinquishment of any such power, not admitted or shown to have been in contemplation of the decedent's death, made within two years prior to his death without such a consideration and affecting the interest or interests (whether arising from one or more transfers or the creation of one or more trusts) of any one beneficiary of a value or aggregate value, at the time of such death, in excess of $5,000, then, to the extent of such excess, such relinquishment or relinquishments shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter."

26 U.S.C.A. Int.Rev.Code, § 811.

8 "Sec. 81.16 Transfers in contemplation of death.—Transfers in contemplation of death made by the decedent after September 8, 1916, other than bona fide sales for an adequate and full consideration in money or money's worth, must

be included in the gross estate. A transfer in contemplation of death is subject to the tax although the decedent parted absolutely and immediately with his title to, and possession and enjoyment of, the property.

"The phrase 'contemplation of death', as used in the statute, does not mean, on the one hand, that general expectation of death such as all persons entertain, nor, on the other, is its meaning restricted to an apprehension that death is imminent or near. A transfer in contemplation of death is a disposition of property prompted by the thought of death (though it need not be solely so prompted). A transfer is prompted by the thought of death if it is made with the purpose of avoiding the tax, or as a substitute for a testamentary disposition of the property, or for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized to determine whether or not such thought prompted the disposition.

"Any transfer without an adequate and full consideration in money or money's worth, made by the decedent within two years of his death, of a material part of his property in the nature of a final disposition or distribution thereof, is, unless shown to the contrary, deemed to have been made in contemplation of death.

\* \* \* \* \* \* \*

"Sec. 81.20 Transfers with power to change the enjoyment.—(a) Transfers included.—Subsection (d) of section 811 embraces a transfer by trust or otherwise (if not amounting to a bona fide sale for an adequate and full consideration in money or money's worth) when at the time of decedent's death the enjoyment of the transferred property, or some part thereof or interest therein, was subject to any change through a power exercisable either by the decedent alone, or by him in conjunction with some other person or persons, to alter, or amend, or revoke, or terminate.

"The addition to subdivision (d) (1) of the Revenue Act of 1926, by section 805 of the Revenue Act of 1936, of the phrase to the effect that it is not material in what capacity the power was subject to exercise by the decedent or by the other person or persons in conjunction with the decedent (which phrase is also embodied in subsection (d) (1) of section 811 of the Internal Revenue

"in contemplation of death" within the meaning of the Revenue Acts. The words "in contemplation of death" mean that the thought of death is the impelling cause of the action resulting in the transfer. The donor's motive must be ascertained by the facts and circumstances, such as his age, mental and physical condition, financial circumstances and all acts that might be taken into consideration to ascertain the thoughts that might have been in the mind of the donor at the time of the transfer. When

---

Code), is considered merely declaratory of the meaning of the subdivision prior to the addition of the phrase.

"The second phrase added to this subdivision of the Revenue Act of 1926 by amendment in 1936 (also embodied in section 811 (d) (1) of the Internal Revenue Code), namely, 'without regard to when or from what source the decedent acquired such power,' is not considered declaratory of the meaning of the subdivision prior to the amendment in a case in which no one of the powers enumerated in the subdivision was reserved at the time of the making of the transfer, but one or more thereof were conferred subsequent thereto (whatever the source from which conferred) without any understanding, expressed or implied, had in connection with the making of the transfer that such power or powers should be later conferred.

"The third change made in the subdivision by the Revenue Act of 1936 (which is also embodied in subsection (d) (1) of section 811 of the Internal Revenue Code) consists of the addition of the words 'or terminate' following the words 'to alter, amend, revoke.' Such addition is considered but declaratory of the meaning of the subdivision prior to the amendment. A power to terminate capable of being so exercised as to revest in the decedent the ownership of the transferred property, or an interest therein, or as otherwise to inure to his benefit or the benefit of his estate, is, to that extent, the equivalent of a power to 'revoke,' and when otherwise so exercisable as to effect a change in the enjoyment, is the equivalent of a power to 'alter.'

\* \* \* \* \* \* \*

"Sec. 81.21 Power relinquished in contemplation of death.—If the decedent had previously held, either alone or in conjunction with another person or persons, a power to alter, amend, revoke, or terminate a transfer made by him, and the power was subsequently relinquished in contemplation of the decedent's death (the relinquishment not amounting to a bona fide sale for an adequate and full consideration in money or money's worth), then to the extent that the transferred property or any interest therein had been subject to such relinquished power it is to be included in the gross estate if coming within any one of the following paragraphs:

\* \* \* \* \* \* \*

"(b) If the transfer was made after the enactment of the Revenue Act of 1924 (4:01 p. m., eastern standard time, June 2, 1924) and before the amendment of the subdivision by the Revenue Act of 1936 became effective (June 23, 1936), and the power was reserved at the time of the transfer and was exercisable by the decedent alone or in conjunction with a person or persons either having or not having a substantial adverse interest or interests in the transferred property, or in conjunction with persons one or more of whom had and one or more of whom had not such an adverse interest.

"(c) If the transfer was made after June 22, 1936 (the date of the enactment of the Revenue Act of 1936), and the power was either reserved at the time of the transfer or later created or conferred, without regard to the source from which the power was acquired, and whether exercisable by the decedent alone or in conjunction with a person or persons either having or not having a substantial adverse interest or interests in the transferred property, or in conjunction with persons one or more of whom had and one or more of whom had not such an adverse interest. If the transfer was made after June 22, 1936, and the person or persons, in conjunction with whom the decedent could exercise the power, relinquished the power in contemplation of the decedent's death and thereby extinguished the power, the transfer is includible in the decedent's gross estate.

"If the relinquishment be not admitted or shown to have been in contemplation of decedent's death, but occurred within two years prior to such death, and affected the interest or interests (whether arising from one or more transfers or the creation of one or more trusts) of any one beneficiary of a value or aggregate value in excess of $5,000 (as of the date of decedent's death, or as of the applicable date under such an election as is referred to in the second paragraph of section 81.15) then, to the extent of such excess, the relinquishment will be deemed, unless shown to the contrary, to have been in contemplation of decedent's death. \* \* \*"

the motive influencing the gift is of the character that it amounts to a testamentary disposition, it is "in contemplation of death". An important factor in determining motive is whether the donor was caused to act by a fear of death or by reasons associated with life. When the objective is to attain ends sought by the donor in his lifetime, the gift is not in contemplation of death, as where the primary and moving cause was to carry out an established custom of making such gifts. The meaning of the language has been thoroughly expounded by the courts. United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867; Becker v. St. Louis Union Trust Co. et al., 296 U.S. 48, 56 S.Ct. 78, 80 L.Ed. 35; Colorado Nat. Bank v. Commissioner, 305 U.S. 23, 59 S.Ct. 48, 82 L.Ed. 20; City Bank Farmers Trust Co. v. McGowan, 323 U.S. 594, 65 S.Ct. 496, 89 L.Ed. 483; Allen v. Trust Co., 326 U.S. 630, 66 S.Ct. 389, 90 L. Ed. 367; Neal et al. v. Commissioner, 8 Cir., 53 F.2d 806; Willcuts v. Stoltze, 8 Cir., 73 F.2d 868; St. Louis Union Trust Co. v. Becker, 8 Cir., 76 F.2d 851; Updike v. Commissioner, 8 Cir., 88 F.2d 807; Loetscher v. Burnet, 60 App.D.C. 38, 46 F. 2d 835; Commissioner v. Nevin, 3 Cir., 47 F.2d 478; Heiner v. Donnan, 3 Cir., 61 F. 2d 113; Lippincott v. Commissioner, 3 Cir., 72 F.2d 788; Brown v. Commissioner, 10 Cir., 74 F.2d 281; McGregor v. Commissioner, 1 Cir., 82 F.2d 948; Routzahn v. Brown, 6 Cir., 95 F.2d 766; Denniston v. Commissioner, 3 Cir., 106 F.2d 925; Blakeslee v. Smith, 2 Cir., 110 F.2d 364; Bradley v. Smith, 7 Cir., 114 F.2d 161; Wishard v. United States, 7 Cir., 143 F.2d 704; Gardner v. United States, D.C., 1 F.Supp. 483; Safe Deposit & Trust Co. v. Tait, D.C., 3 F.Supp. 51; Poor v. White, D. C., 8 F.Supp. 995; Levi v. United States, 14 F.Supp. 513, 83 Ct.Cl. 284; Old Colony Trust Co. v. United States, D.C., 15 F.Supp. 417; Myers v. Magruder, D.C., 15 F.Supp. 488; Smith v. United States, D.C., 16 F.Supp. 397, 401; United States Trust Co. of New York v. United States, 23 F. Supp. 476, 87 Ct.Cl. 721; Central Nat. Bank of Cleveland v. United States, 41 F. Supp. 239, 94 Ct.Cl. 527; Proctor v. Hassett, D.C., 52 F.Supp. 12; Tonkin v. United States, D.C., 56 F.Supp. 817; Fair v. United States, D.C., 59 F.Supp. 801; Gamble v. United States, D.C., 65 F.Supp. 114.

United States v. Wells, supra, is the leading case on gifts in contemplation of death. Wells died in August, 1921, at the age of 73 years. He had made gifts to the members of his family aggregating nearly $800,-000, retaining assets of the value of $900,-000. He had commenced the practice of making gifts as early as 1901, for the reason contained in a statement as follows [283 U.S. 102, 51 S.Ct. 447]: "I am making distribution from time to time of part of my property to see what my children will do during my lifetime, and I will then know when my time is up what I ought to do with the balance." During the two years prior to his death, he was ill, was in and out of hospitals, frequently consulted specialists but was told and believed that he would recover. The Commissioner included the value of Wells' gifts made within two years of death in his gross estate and assessed the deficiency which was paid. The estate claimed a refund which was denied and suit to recover was brought in the Court of Claims. The court held that the gifts were not made in contemplation of death, and the Supreme Court affirmed. In part the court said:

"The quality which brings the transfer within the statute is indicated by the context and manifest purpose. Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after the death of the transferor. The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. Nichols v. Coolidge, 274 U.S. 531, 542, 47 S.Ct. 710, 71 L.Ed. 1184, 1192, 52 A.L.R. 1081; Milliken v. United States, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809 * * *. As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated', that is, the motive which induces the transfer must be of the sort

which leads to testamentary disposition. As a condition of body or mind that naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or nonexistence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death. The natural and reasonable inference which may be drawn from the fact that but a short period intervenes between the transfer and death is recognized by the statutory provision creating a presumption in the case of gifts within two years prior to death. But this presumption, by the statute before us, is expressly stated to be a rebuttable one, and the mere fact that death ensues even shortly after the gift does not determine absolutely that it is in contemplation of death. The question, necessarily, is as to the state of mind of the donor.

"As the test, despite varying circumstances, is always to be found in motive, it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand'.

"If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive."

In Becker v. St. Louis Union Trust Co., supra, the decedent in 1921 conveyed to himself as trustee four separate trusts, each for the benefit of one of his four children, property which was at the time of his death worth nearly a million dollars. He was 76 years of age when he established the trusts. His death occurred seven years later at the age of 83 years. The commissioner determined a deficiency in the estate tax which was paid and suit brought for a refund. The District Court upheld the Commissioner. The Circuit Court of Appeals (8 Cir., 76 F.2d 851) reversed the District Court and was sustained by the Supreme Court. In part the court said [296 U.S. 48, 56 S.Ct. 80]:

"In the present case, the district court found that the motive of decedent was to decrease his income tax by distributing a portion of his property among the four trusts and, at the same time, to make provision for the distribution of the property to his children at decedent's death, and concluded therefrom that the transfer was made in contemplation of death. The Circuit Court of Appeals reached the opposite conclusion. It found on the evidence that the decedent, in making the trusts, was actuated by two motives—(1) To make his children independent; (2) to avoid high surtaxes on his income; and that both of these motives were associated with life. Evidence that the decedent was in any way influenced in what he did by the thought of death, that court said, was entirely lacking.

"It is true that the decedent at the time of making the trusts was 76 years of age. But the evidence shows clearly that he was in excellent health, attending regularly to business, apparently was not looking forward in any way to his death, came of a very long-lived family, expected to live well beyond the age of 90, and in fact lived

seven years after making the trusts. The beneficiaries were all past 21 years of age, and the record shows only that' the grantor's objects were to make them allowances in order to get rid of the nuisance of treating them as children, make them independent so they would know what they were to get each year, and, as he had ample income of his own, to avoid the high surtax and make each of his children pay a tax on the independent income received."

In Colorado Nat. Bank v. Commissioner, supra, Hendrie had made a will in 1925 in which he gave substantially all his property in trust for the benefit of his daughter and her children. In 1927 when 80 years old and in good health he irrevocably conveyed in trust to a bank securities of the value of $800,000. He died five and one-half years later. The Commissioner ruled that the transfer was in contemplation of death, but the tax court held otherwise. The 'Circuit Court of Appeals reversed and was in turn reversed by the Supreme Court. The transfer was made for the purpose of putting out of decedent's control, and beyond risk of loss in stockmarket speculations in which he was engaged, enough of his property adequately to provide for the financial security of his daughter and her children after his death. In part the court said [305 U.S. 23, 59 S.Ct. 49]: "The court's opinion seems to rest upon an erroneous interpretation of the term 'in contemplation of death'. The meaning of this was much discussed in United States v. Wells, supra. We adhere to what was there said. The mere purpose to make provision for children after a donor's death is not enough conclusively to establish that action to that end was 'in contemplation of death.' Broadly speaking, thoughtful men habitually act with regard to ultimate death but something more than this is required in order to show that a conveyance comes within the ambit of the statute."

In City Bank Farmers Trust Co. v. McGowan, supra, the Supreme Court considered whether gifts in large amounts made by a New York court out of the estate of an insane person might be considered gifts made in contemplation of death. The court held that the gifts were similar in character to those made by the donor while competent and 'were not in contemplation of death especially as they represented sums which the donees would inherit when death of the donor occurred. In part the court said [323 U.S. 594, 65 S.Ct. 498]: "The applicable test is that stated in United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867. This is whether the thought of death is the impelling cause of the transfer."

In Allen v. Trust Co. of Georgia, supra, there were transfers by donor at times of advance age. There were reservations of power to alter and amend the trusts. There was a relinquishment of those powers within two years of death. In 1925 gifts were made to a son and daughter by the donor when he was 69 years of age. In 1934 when he was 78 years of age, he enlarged the trusts, doubling the amount of each. He reserved the express power with the consent of the trustee and life beneficiary, "to amend, change, enlarge or limit, but in no event to revoke the terms of the agreement". In 1937 when 81 years of age and after being advised that unless he relinquished his power to alter and amend, the trust funds would be included in his gross estate at death and would be taxable as a part thereof. He released his power and died less than two years later. At the time the gifts were made, he intended them to be complete and absolute and believed that they were and that the trust property passed absolutely out of him for all purposes, including the estate taxes. His interpretation of the law as then contained justified that belief. He paid gift taxes on the full value of the property. At the time the trusts were executed and the power released, he was in average good health for a man of his age. In part the court said:

"The gifts were made by the decedent to relieve the needs and to make secure the maintenance of his children and the education and support of his grandchildren. The gifts were placed in trust because Suzanne and Jack had lost prior gifts in unsuccessful projects. The decedent desired to protect them against their own business misadventures and not to retain any benefit, directly or indirectly, to himself. He made the gifts to meet their necessities and de-

sired to set aside the trust property, freed from all claims, tax or otherwise. The decedent, however, retained under the trusts a power to amend with the consent of the trustee and beneficiary. At the time the trusts were established in 1925 and enlarged in 1934 he believed that the gifts were complete and absolute and intended them to be such. He was a lawyer and believed that under the federal law the reservation of such a power to amend would not require the inclusion in his gross estate at his death of the value of the corpus of each trust. But in 1935 Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 56 S.Ct. 70, 80 L.Ed. 62, was decided, holding that the reservation of a power to amend brought the corpus of the trust into the settlor's estate, even though the power could not be exercised by the settlor alone. Upon being advised in 1937 that the gifts remained a part of his estate for estate tax purposes, decedent executed an instrument renouncing the power to amend the trusts. This was done so that the trusts would not be a part of his estate for estate tax purposes. At that time, as well as in 1925 and 1934, the decedent was in average good health for a man of his age. He released the power to amend so as to put the trusts in the condition he had thought they were in when he made them. The release was designed to carry out his original purpose in setting aside the property freed from all claims, tax or otherwise. In 1925, 1934, and 1937, he did not entertain thoughts of death except the general expectation of death that all entertain. * * *" 326 U. S. at page 632, 66 S.Ct. at page 389, 90 L. Ed. 367.

"It is said, however, that those findings rest on a misconception of the law, since admittedly the decedent in 1937 released the power to amend so as to avoid paying an estate tax on the property included under the trusts. But that is to isolate the release from all that preceded and to treat it as a wholly independent transaction. This is not a case where a settlor, having made one plan for the disposition of his property, later makes a different one to avoid death taxes. Mr. Spalding, in making the release, did what he originally intended to do—to make complete and absolute gifts to his children, freed of all claims, including taxes. Retention of the power to amend would have brought the trust property into Mr. Spalding's estate and subjected it to the estate tax lien. His purpose to take care of his children, come what may, might thus have been thwarted or impaired. He guessed wrong on the law, when he retained the power to amend. When he rectified the error, he was in good faith, endeavoring to complete his original project, not to give his children more than he at first intended in order to save taxes. What he did in 1937 was merely to accomplish by an additional step what he assumed he had already done. The findings make plain that the establishment of the trusts in 1925, their enlargement in 1934, and the release of the power to amend in 1937 were parts of one integrated transaction." 326 U.S. at page 636, 66 S.Ct. at page 392, 90 L.Ed 367.

In St. Louis Union Trust Co. v. Becker, supra, the facts are very similar to the case at bar. The settlor was 76 years of age; the health and habits literally could be substituted for those of Bell. The donor lived for seven and one-half years after creating the trust while Bell lived for eight and one-half years. The deficiency assessment was based on the inclusion in the gross estate of four trusts valued at one million dollars. The additional tax was paid and there was a suit for recovery of a refund. Two major questions were involved: (1) was the transfer of the property included in the trust intended to effect possession or enjoyment at or after death; (2) was the transfer made in contemplation of death. The court in an elaborate opinion by Judge Sanborn said [76 F.2d 863]:

"According to the evidence, Mr. Guy, in making these trusts, was actuated by two motives: (1) To make his children independent; (2) to avoid high surtaxes upon his income. Both of these motives were intimately associated with life. United States v. Wells et al., Ex'rs, supra, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867; Willcuts v. Stoltze, 8 Cir., supra, 73 F.2d 868. Evidence that Mr. Guy was in any way influenced in what he did by the thought of death is entirely lacking.

"The suggestion of the appellee, that the determination by the Commissioner that the transfers were made in contemplation of death would support the lower court's finding to that effect, is obviously unsound. Any presumption as to the correctness of the Commissioner's determination is a rebuttable one and would only support such a finding in the absence of any substantial evidence to the contrary. (Authorities)".

In Wishard v. United States, supra, the decedent, owner of an annuity policy payable to himself, on February 20, 1934, at the age of 82 years assigned the policy and its income to his wife and sister, without retaining any interest in himself. The contention was made that because of his age and physical condition the transfer should have been found to have been made in contemplation of death. The district court found otherwise, and its decision was affirmed. Many witnesses gave testimony supporting the conclusions that Wishard for his years was remarkably active and alert both mentally and physically. In part the court said [143 F.2d 708]: "But it is well settled that advanced age of itself is not the decisive test in determining whether contemplation of death was the principal motivating cause of a transfer. (Authorities) Nor does the mere fact that Special Provision B, in connection with defining contingencies under which the rights of the beneficiaries to share in the proceeds of the policy come into existence, refers to the decedent's death seven times necessitate "the conclusion that contemplation of death induced the transfer. This shows merely that general apprehension of death of which Section 81.16 of Treasury Regulations 105 speaks as not sufficient to bring a transfer within the statute. Nor are we impressed by defendant's arguments that decedent could have achieved the desired result by a simpler method if his motive was to give his wife and sister an income for life. For he had the right to give them whatever he wanted in whatever manner he chose, and there is no evidence whatever suggesting that decedent was motivated by a desire to escape estate taxes."

In Smith v. United States, supra, the decedent made a transfer in trust of 60% of his property valued at $1,150,000 on November 24, 1930, when he was 73 years of age. His reason was to put that much of his property in the hands of trustees for management, in order that he and his family would be protected in case he became physically and mentally incapable of attending to those matters himself, and apparently had been much impressed by the experience of an acquaintance whose property had been dissipated after he had become aged and incompetent. His history as to a heart ailment and medical treatments between 1925 and date of his death on February 11, 1933, closely resemble the medical history of Bell. In part the court in holding that the transfer was not made in contemplation of death said [16 F.Supp. 401]:

"Although Farnsworth was well along in years, nothing had occurred to lead him to believe that there was any immediate danger of death. Of course, one of his age, would not have a long expectancy of life, but the age of the settlor of a trust has never been deemed, of itself, sufficient evidence to show contemplation of death. (Authorities) In some of these cases death followed within the two years after the transfer.

"It is argued that the transfer should be deemed as one made in contemplation of death because the decedent thereby provided for his family after his death, and, therefore, it was a testamentary disposition of his property. I take it this is not the test. If it were, every irrevocable trust that provided for a disposition of the trust property after the death of the donor would necessarily be deemed a transfer by way of trust in contemplation of death. That such a test has never been applied is obvious from consideration of the cases."

"If we apply the criterion laid down in the case of United States v. Wells, supra, we are brought to the conclusion that the transfer was not one in contemplation of death. Rather, it is one intended by the donor to accomplish some purpose, desirable to him if he continued to live."

Much has been said on the subject of gifts inter vivos and gifts causa mortis, but some of the principles applicable to such gifts, according to the decisions above cited, are well defined: Acts of the

settlor indicating a desire to follow a plan during his life in sharing his wealth with others so that there may be present enjoyment of it, is evidence of contemplation of life and not of death. A desire to make children or other members of the family financially independent is associated with life and not with death. A taxpayer properly may reduce his income tax by gifts from his estate. Age of the settlor is not a decisive test of the motive for the gift.

 The courts have held that the action of the Commissioner of Internal Revenue in assessing additional estate taxes is presumed to have been correct; that the plaintiffs have the burden to overcome that presumption; that the statute required the inclusion in the gross estate of all transfers made in contemplation of death not merely made solely in such contemplation; that the burden is not sustained if a motive is as consistent with a testamentary disposition of property as with a gift inter vivos, or if two motives are disclosed either of which might have accounted for the transfer, the one testamentary and the other not. Land Title & Trust Co. v. McCaughn, D. C., 7 F.Supp. 742; First Trust & Deposit Co. v. Shaughnessy, 2 Cir., 134 F.2d 940, certiorari denied 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 442; that the taxpayer must show the decedent's dominating motive; that where a donor's motive in making a gift is to avoid estate taxation, the gift is a substitute for a bequest and properly is held to have been made in contemplation of death. Vanderlip v. Commissioner, 2 Cir., 155 F.2d 152; that if transfers are the result of death motives it is immaterial that there also were motives associated with continued life. Farmers' Loan & Trust Co. v. Bowers, 2 Cir., 68 F.2d 916, certiorari denied 293 U.S. 565, 55 S.Ct. 76, 79 L.Ed. 665; Turner v. Hassett, D. C., 37 F.Supp. 996; Tait v. Safe Deposit & Trust Co., 4 Cir., 74 F.2d 851. However, this is a trial de novo and the court is not required to accept the action of the Commissioner as final and conclusive irrespective of the evidence in the trial of this case.

 The trust instruments under consideration are clear and unambiguous in their provisions. The decedent constituted himself trustee of the bonds with power to invest and reinvest. He was required to pay the whole of the income annually to the beneficiary. The trusts were to remain in effect until decedent's death or until the death of the beneficiary in each instance. On his death the corpus was to be delivered to the beneficiary. On the death of a beneficiary before decedent, the trust estate was to be paid to any one designated by the beneficiary. In default of a designation, the estate was to be distributed to the heirs at law of the beneficiary. The trust instruments expressly provided that the donor could not be a beneficiary.

The donor reserved the power, in his discretion, to distribute all or any part of the trust estate to the beneficiaries at any time prior to its termination by its terms. The donor parted finally and completely with every vestige of beneficial ownership in the bonds that were the subject of his gifts in 1935. He transferred entire ownership to the beneficiaries. Nothing that he might do could withdraw any part of the beneficial interest in the bonds from the beneficiaries. No other person could by any act of his share in their ownership. He could not withdraw, decrease, or modify their ownership. The nature of the trust fund and the power of its management was of such character that he as trustee, or as donor, could not gain any financial advantage for himself, or use his power to serve any purpose beneficial to himself. There was no reservation of power to change the gifts in any respect. If the donor exercised any power vested in him, the trust funds would go to the beneficiaries. If he did not exercise it, the fund likewise would go to the beneficiaries.

The plaintiffs contend: (1) Even if the statutory presumption is applicable under the facts of this case, neither the trusts made in 1935, nor the relinquishment thereof in 1943, were made in contemplation of death; (2) the right of accelerating the time in which the corpora were to be delivered to the beneficiaries, where the exercise of such right cannot possibly affect the interest of any other person, does not come within the language of the act relating to the power to alter, amend, revoke, or terminate the trusts; and (3) the settlor

did not retain in the trust instruments power to alter, amend, revoke, or terminate the trusts under the provisions of the act and, consequently, no such power was relinquished.

The defendant contends that the decedent reserved the right to alter, amend, revoke or terminate the trusts and that the statutory presumption applies. This contention is based on the provision of the trust instruments as follows: "So long as the donor, D. L. Bell, shall act as trustee or co-trustee of this trust, he shall have the power in his absolute discretion, to distribute all or any part of the principal of the trust estate to the beneficiary, Nellie V. Bell (Minnie A. Bell) at any time prior to its termination by its terms. It is hereby expressly provided that the donor is not a beneficiary under this trust."

A brief review of the evidence in the light of the foregoing authorities will be helpful. Decedent was born October 3, 1863, his sister Minnie January 10, 1868, and his sister Nellie February 9, 1870. None of them had ever married. They lived together, spent their time in each other's company and were devoted to each other's welfare and happiness. The sisters kept the home, and the decedent conducted the business. He was successful and shared his prosperity with his sisters. At his death his estate was valued at $465,626. His sisters at that time each held securities of the value of $100,000 to $125,000 in addition to the trusts here involved. The two sisters together were worth financially approximately the same as the decedent, and he had given it to them.

The decedent was six feet tall, usually weighed about 180 pounds, and was a strong, happy, cheerful man. He never spent a day in a hospital in his life. He was confined to his bed with colds only occasionally, sometimes spending two or three days at home. He was active in his business and went to his office almost daily till his last illness. It is noteworthy that he did not consult a doctor from October 1, 1939, to October 3, 1943, a period of four years when he was 76 to 80 years of age.

The books of the family physician furnish a complete record of the medical services rendered to the decedent. In 12 years, from September, 1931 to October, 1943, the calls averaged less than two a year, many were due to colds. The calls were at the doctor's office or in the Bell home as follows: In 1931 September 21 (first call); in 1932 October 18; in 1933 none; in 1934 April 11, 12, 25, December 3, 4, 16; in 1935 September 10, October 4, December 8 and 9; in 1936 none; in 1937 January 4, April 2, 3, 4, 5; in 1938 none; in 1939 September 27, 28, 29, and October 1; in 1940 none; in 1941 none; in 1942 none; in 1943 October 3, 4, 6, 17 and 29, November 4, 6, 10 and December 27; in 1944 January 12, 13, 26, February 5 to March 15 daily (final illness death on March 15).

At the first call the patient complained of pain in the chest, distress on exertion, and shortness of breath when ascending stairs. Otherwise, his condition was comfortable. The doctor diagnosed his condition as a heart ailment due to arteriosclerosis which interfered with circulation. The doctor testified that the patient had chronic endocarditis, miocarditis, arteriosclerosis, and angina pectoris, a development during the later years of his life. He advised the patient to restrict his activities, to rest, and to take sedatives when necessary. He did not inform the patient of a heart condition but gave nitrate tablets to the sisters for emergency use in the event of a severe attack. He was of the opinion that the patient never had a severe attack. There is no evidence that the decedent was informed of his condition, that he worried about it or was concerned with any thought of death. The testimony of the doctor rather was to the effect that he told the decedent very little about his condition. He was of the opinion that the decedent "as a man of intelligence knew that something was wrong with his heart," but the doctor further testified that in his opinion "the heart condition did not contribute at all to the decedent's death." The decedent "never discussed the possibility of death with the doctor." It appears that as age advanced the arteries of the decedent slowly but surely were undergoing the hardening process so common to old age. This condition was progressive and in time involved the circulatory system. Hypostatic

pneumonia was assigned as the cause of death.

For many years decedent employed a lawyer who specialized in taxation to prepare his income tax returns and to advise him in tax matters. This attorney testified that decedent regarded the property as held in common with his sisters, and thought it should not make any difference whether the interest on their bonds was reported as his or his sisters. The attorney advised him that he could not do that. If he wanted his sisters to report the income as theirs, he should give them the bonds, and if he did so, he would have to pay a gift tax on their value. The bonds then would belong to the sisters and they would have to pay the income taxes. The saving in income tax by termination of the trusts and the unconditional gift of the bonds to the sisters was calculated and considered; also that the income on them should be reported as that of the sisters and not of the decedent. The attorney testified that he told decedent that he could split the income, reduce his income tax and get rid of the trusts and the necessity of making returns on them. That idea was agreeable to the decedent who said "Let's do that; let's do that then." Whereupon the letter of May 10, 1943, was prepared by the attorney and signed by the three. The gift taxes were calculated and paid in the sum of $8,111.80. One of the sisters testified that the bonds were delivered to them before the letter of May 10, 1943, but she was unable to say whether it was in 1941 or 1942. The trusts were made on the advice of the attorney who likewise advised the relinquishment.

The first question is whether the trust instruments of July 16, 1935, were executed in contemplation of death. At that time the decedent was 71 years and nine months of age. It was eight years and eight months before his death. At the time the decedent had not called on his doctor for more than six months. From September 21, 1931, to the date of the making of the trusts, he consulted his doctor only eight times.

Clearly the thought uppermost in the mind of the decedent on the date the trusts were executed was to make his sisters financially independent. Prior to January 2, 1935, he had given them more than $100,000 each. On that date he made his will in which he gave them all of his estate effective at his death. Six months later he made the trusts here involved vesting in them the beneficial interest in the bonds thus further equalizing the holdings of the family group. Obviously he desired them to have the bonds and enjoy the income therefrom during the remainder of his life. There was nothing of a testamentary character in making the trusts of July 16, 1935. Except for age and the condition of his arteries, there is no evidence of circumstances that would lead him to contemplate death, and when those facts are considered with all the facts before the court, the evidence will not sustain a conclusion that the motive for making the trusts was prompted by a fear of death.

Whether the action of the decedent in terminating the trusts on May 10, 1943, was in contemplation of death presents the next problem for consideration. The decedent then was 79 years and eight months of age and undoubtedly his health was more impaired than in 1935. Notwithstanding this, he lived for 10 months and five days thereafter. He had not consulted his doctor for three and one-half years and did not do so until five months later. Evidently he was not worried about his health. When a man of substantial means has not consulted his doctor during the four years from 76 to 80, he obviously is not very greatly concerned about death.

The relinquishment of the trusts in 1943 must be considered with the facts pertaining to their establishment in 1935. If the decedent had launched a program of trust making in 1943, it would have presented a different situation. His action in 1943, when considered with what had gone before, justifies the conclusion that he was following an integrated plan he had adopted years before of dividing with his sisters. He could reduce the surtaxes on his income, eliminate the necessity of making returns on the trusts, further equalize the property with his sisters and simplify the financial situation of the three by terminating the trusts and by carrying out the plan

made manifest by the division he had made with his sisters through the years. This was the dominating motive that controlled his action.

The decedent may have considered the estate tax feature. His attorney testified that he informed the decedent that relinquishment of the trusts would remove the bonds from his estate and thus reduce the estate taxes, but he further testified that the decedent apparently was not impressed with that. The evidence is not sufficient to support a conclusion that the decedent relinquish the trusts to escape estate taxes.

Assuming, but not deciding, that the statutory presumption applies under the facts of this case, it has been rebutted by the evidence. A finding in this case that the relinquishment was made in contemplation of death cannot be sustained. The evidence falls short of proving the "impelling cause" or "controlling motive" as prescribed by Wells v. United States, supra.

In view of the conclusions that the trusts here involved or the relinquishment thereof were not made in contemplation of death, a decision of other issues by this court is unnecessary.

The plaintiffs are entitled to judgment.